Carol **BATTLE** et al., Plaintiffs,

v.

The **MUNICIPAL HOUSING AUTHORITY FOR the CITY OF YONKERS** et al., Defendants.

No. 71 Civ. 2588.

United States District Court,
S. D. New York.

Sept. 2, 1971.

The Legal Aid Society of Westchester County, Yonkers, N. Y., for plaintiffs; Martin A. Schwartz, White Plains, Dennis T. Barrett, Middletown, N. Y., of counsel.

Bongiorno & Macellaro, New York City, for defendants; Charles J. Macellaro, New York City, of counsel.

LASKER, District Judge.

Plaintiffs are welfare recipients residing in the City of Yonkers, New York. They move (1) for determination of this action as a class action and (2) for a preliminary injunction against the Municipal Housing Authority ("MHA") of

Yonkers to restrain it from refusing to rent to them (and the class they propose to represent) apartments in MHA projects solely because their leases are not co-signed by the Westchester County Department of Social Services (the "Department").

Plaintiffs claim violation of their rights under the equal protection and due process clauses of the Fifth and Fourteenth Amendments, as well as several statutory grounds. Jurisdiction is properly founded on 28 U.S.C. § 1343(3) and (4).[1]

## FACTS

Defendant MHA is a public "corporate governmental agency" (§ 3(2) Public Housing Law, 44A McKinney's Consol.Laws, c. 44–A). It derives financial support from the State of New York, the City of Yonkers, and the United States Government. On May 4, 1971, the MHA at its regular meeting unanimously voted to require the Westchester County Department of Social Services to co-sign the leases of all tenants who are given financial assistance by the Department. Emmett Burke, Secretary-Director of MHA, notified the Commissioner of the Department by letter dated May 10, 1971, of the reasons for the policy:

"This act was made necessary to recover payment of charges of vacating tenants not covered by the amount of the Security Deposit of the tenant, and thus eliminate discrimination against all other tenants held responsible beyond the amount of the Security Deposit. * * * The effective date for the enactment of this resolution is May 5th, 1971."

---

1. Plaintiff also predicates jurisdiction on 28 U.S.C. § 1331 (federal question), and 42 U.S.C. § 3612 (fair housing provisions of the Civil Rights Act of 1968). Since injunctive relief is found warranted on constitutional grounds, it is unnecessary to consider the merits of the statutory arguments. It should be noted that by stipulation of the parties August 2, 1971, defendants waived certain objections to

service of the summons and complaint, and plaintiffs dismissed the action as against defendants Henry J. Romatowski and Emmett Burke in their individual private capacities, suing them only in their individual official capacities. We treat this stipulation as satisfying the provisions of Rule 41(a) (1) (ii), F.R.Civ.P., constituting a voluntary dismissal of personal private liability only.

In his affidavit in opposition to these motions Burke provides MHA statistics indicating the underlying motivation for the May 4th resolution. He reports that there are presently 2,165 MHA apartments, 577 occupied by welfare recipients, 1,000 by senior citizens, the balance presumably by low income persons. In the three-year period January 1, 1968 to December 31, 1970, 621 tenants vacated their facilities, 47 of whom were welfare recipients. Of the 47, 26 tenants left owing MHA money for damages; of the other 574 tenants vacating, 72 left owing MHA money for damages.

MHA computes that 55.3% of all welfare recipients who are tenants leave owing MHA money, while only 12.6% of non-welfare tenants fall into this category. Burke observed that, while some recovery could be made against non-welfare tenants, MHA is unable to recover damages from welfare tenants because they have no assets. Accordingly, the MHA decided to look to the Department for this additional sum rather than passing the costs on to other tenants in the form of increased rents. As Burke put it, "It is as a matter of prudent and reasonable business policy, based on the defendant Authority's past experience with respect to the much larger amount of damages due to the neglect and wilful destruction by tenants [sic], that the defendant Authority requested the Department of Social Services to co-sign the lease." (Affidavit of Emmett Burke, sworn to July 26, 1971.)

Although Burke remarks that the MHA "has had and does now have the authority to so require [co-signing] in all proper cases, whether these involve public assistance recipients or not," it appears that the only application of this now against recipients of welfare as a requirement to tenants by the MHA is class.

Plaintiffs receive financial assistance from the Department. Plaintiff Battle and her eleven-year-old daughter, and plaintiff Kelley with her daughters aged eight and four, lost their lodging and all their possessions by fire on April 22, and May 2, 1971, respectively. They were placed then in the Yonkers Motor Inn. Plaintiff Harper lives with her four children, aged ten, eight, six and five, in a five-room apartment on Buena Vista Avenue in Yonkers. Battle and her daughter moved into Harper's apartment "because the motel in which she had been residing was too distant from her daughter's school and was inadequate for her needs and because she expected to obtain a public housing apartment within several days. Plaintiff is most anxious to move from these premises because they are overcrowded and are in a substandard building in a blighted area." (Complaint, par. 11.) The building is reported to have holes in the walls and ceilings, broken windows, plumbing defects and vermin; during the past year fights between tenants and a shooting are reported.

Plaintiff Kelley and her children are now in one room of the Yonkers Motor Inn, lacking kitchen facilities. They must eat in a restaurant, and the eight-year-old daughter must take a taxicab to school because of the distance.

All three plaintiffs applied to MHA for suitable housing and were informed in April and May that apartments were available or would be shortly available to them. Each plaintiff was later informed by MHA that she would not be given the apartment unless the Department of Social Services co-signed the lease.

The Commissioner of the Department informed the MHA by letter dated May 13, 1971, that "our County Attorney * * * has advised that our Department lacks the authority to co-sign a lease for a tenant in receipt of public assistance at a public housing project or elsewhere, and that the Department's fulfillment of needs of welfare recipients, including shelter costs, does not include taking on the responsibility of tenants under the terms of the lease." (Exhibit D to Ver-

ified Complaint.) Accordingly, the Department refused to co-sign the lease of each of the plaintiffs, which had the result of barring plaintiffs from the MHA housing.

## CLASS ACTION

We turn first to plaintiffs' application that this action be determined to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure. Defendant MHA opposes the motion, arguing that "there is no showing of any sort as to how many members of the class there are." Aside from urging this defect in plaintiffs' ability to comply with Rule 23(a) (1), defendant does not contest or discuss any of the other requirements of Rule 23(a) or (b).

On the record here presented it is clear that all requirements of Rule 23 are met by this action, and for the reasons set forth below it is determined to be a proper class action.

Plaintiffs define the class in their complaint as follows:

"[A]ll public assistance recipients who reside in Yonkers, New York, who have been or may be denied applications and/or declared ineligible or denied apartments in public housing facilities operated by the defendants solely on account of defendants' practice and policy of refusing to rent apartments to public assistance recipients based on their requirement that the Westchester County Department of Social Services co-sign recipients' leases." (par. 3 of Complaint).

The numerosity of such a class is documented in the record before us. It is estimated that some 16,800 persons received public assistance in Yonkers as of March 31, 1971. Of the 2,165 public housing apartments controlled by MHA, 577 were occupied by tenants who were public assistance recipients as of July 26, 1971. Although no facts are given which would reveal how many additional welfare recipients (such as plaintiffs)

might seek housing in MHA facilities, a class of at least 580 tenants or prospective tenants is sufficiently large to satisfy the numerosity requirement of Rule 23(a)(1). Given the much large number of welfare recipients in Yonkers, it is not unreasonable to infer that the class is a good deal larger than 580.

The other requirements of Rule 23(a) are also met. Inasmuch as the MHA policy applies to all persons receiving welfare, common questions of law and fact exist as to the entire class (Rule 23(a)(2)), and the claims of the representative parties are typical of the class as a whole, and those representative parties, represented here by able counsel, will certainly fairly and adequately protect the interests of the class (Rule 23(a)(3), (4)).

It is also evident that the requirements of Rule 23(b) are met. Rule 23(b)(2) provides that class action is proper when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This formula applies to the case at hand.

Accordingly, it is determined that the case has properly been brought as a class action, and plaintiffs' definition of the class is acceptable. The parties shall submit orders setting forth a proposed notice to members of the class, including a description of the substance of the case and the time within which members of the class must opt out. Notice shall be sent by first class mail to all members of the class. MHA shall furnish to plaintiffs a list of persons who are presently members of the class and, pendente lite, the names and addresses of any persons who may become members of the class. The notice shall be prepared in the least costly fashion feasible, and the expense of such preparation and mailing shall be borne by defendant MHA. In lieu of first class mailing, MHA may de-

liver the notice directly to all members of the class who reside in MHA facilities provided MHA secures a receipt on delivery from any person to whom the notice is so delivered.

## PRELIMINARY INJUNCTION

■ The classic criteria applied in determining the propriety of granting a preliminary injunction are: (1) the probability of plaintiffs' success on the merits; (2) the irreparability of damage to plaintiffs pendente lite; (3) the balance of hardship between the parties; and (4) the public interest. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir., 1969); Clairol, Inc. v. Gillette Co., 389 F.2d 264 (2d Cir., 1968); Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir., 1966); Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738 (2d Cir., 1953).

### (a) Probability of success

■ As to the probability of success on the merits, plaintiffs have made a compelling showing that their Fifth and Fourteenth Amendment rights to due process and equal protection of the law have been denied. Finding the probability of success so likely on the constitutional grounds, we need not reach the various statutory arguments which plaintiffs also press.[2]

Plaintiffs' allegations that MHA's policy and practice of requiring that the Department co-sign welfare recipients' leases (and the leases of such persons only) violates the equal protection clause of the Fourteenth Amendment are sound. It is true that equal protection "is offended only if the classification [enacted by the State] rests on grounds

wholly irrelevant to the achievement of the State's objective. * * * A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. [citing cases]." McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

Here, however, MHA's classification is unsupported by the facts and offends the requirement of equal protection.[3] MHA has created a classification which lumps together the nearly 50% of welfare tenants who vacate owing MHA *no* money with those who vacate owing damages. It makes no effort to apply the same requirements of co-signature to its other tenants, including the 12.6% of non-welfare tenants who leave owing MHA money for damages. No one denies that MHA has a responsibility to act in a fiscally responsible manner to minimize the costs it incurs because some tenants leave the premises owing MHA money for damages. Yet, however appropriate this authority to require co-signing of leases "in proper cases," MHA cannot create an arbitrary application of this authority which does not reasonably reflect or relate to the underlying facts. Merely because MHA has the power *not* to discriminate does not give it the right *to* discriminate.

"Lines drawn on the basis of wealth or property, like those of race * * *, are traditionally disfavored." Harper v. Virginia Board of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966). MHA has created an invidious distinction based upon the source of an individual tenant's wealth without any independent analysis of whether any

2. Plaintiffs also contend that the MHA requirement of co-signing violates 42 U.S.C. § 1401 et seq. (Low Rent Housing), 42 U.S.C. § 601 et seq. (Grants to States for Aid and Services to Needy Families with Children and for Child-Welfare Services), and 42 U.S.C. § 3601 et seq. (fair housing provisions of 1968 Civil Rights Act).

3. Because of the finding that MHA's practice and policy are arbitrary and capricious, there is no need to rule on whether the equal protection clause is violated on the further ground that there is no *"compelling* governmental interest" to support MHA's actions. See Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

given tenant is likely to cause loss to MHA.

In Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y. 1968), this court held that applicants denied admission to a housing project *solely* on the basis of their status as welfare recipients violated the equal protection clause of the Fourteenth Amendment. In that case the court stated:

"It appears clear to this Court that a welfare recipient need not be an uncooperative tenant, an indifferent occupant or an inconsiderate neighbor. Regarding the welfare recipients' reliability as to payment of the monthly rent, it would seem that some welfare recipients may have a history of delinquency in their payments whereas others may have been consistently dependable. Naturally, this Court would not require defendants to accept those recipients of welfare funds who would, of necessity, be required to devote an unreasonable portion of their income to the payment of their rent, thereby making non-payment a likelihood. However, where the welfare recipient has been known to be reliable and where his application for tenancy has been approved by the Department of Social Services as being compatible with his support budget, it would be an arbitrary classification in violation of the Equal Protection Clause of the Fourteenth Amendment to reject that applicant, despite whatever personal qualities he may possess, solely on the basis of the applicant's status as a recipient of welfare funds. The day has passed when a citizen's right to participate in publicly-aided, publicly-supervised projects can be irrationally or arbitrarily withheld. [citing cases]." *Id.*, 138–139.

In the instant case, MHA's classification is without relationship to the facts or its legitimate interests in operating its housing on a fiscally responsible basis. The effect of the discrimination is to bar *all* welfare tenants, and *only* welfare tenants, from MHA housing, since the Department regards itself without authority to co-sign leases.

Defendants' assertion that the Department has authority to co-sign leases is irrelevant to the equal protection issue here. Even if the Department had such authority, that authority would not dilute or eliminate the defect of defendants' classification. MHA's reliance on Male v. Crossroads Associates, 320 F. Supp. 141 (S.D.N.Y.1970), is misplaced. That case dealt with a private entrepreneur, and the court there determined that no State action was involved. Accordingly, the Fourteenth Amendment was inapplicable and the case offers no guidance here.

Plaintiffs' further contention, that the MHA policy and practice violate the due process clause, also has merit. Plaintiffs do not challenge MHA's contention that it has authority to require co-signing of leases "in proper cases." What is singled out for criticism is the lack of any standards to determine what is a "proper" case. MHA's requirements apply to the 44.7% of welfare tenants who leave public housing owing no money, but do not apply to the 12.6% of non-welfare tenants who vacate owing money for damages. MHA's rationale, that more welfare tenants, on a percentage basis, than non-welfare tenants leave owing money is unpersuasive as a basis for a classification that applies to *all* welfare tenants and *only* welfare tenants. Not only do nearly 50% of welfare tenants leave owing no damages but of the 98 tenants vacating owing money between January 1, 1968 and December 31, 1970, only some one-third were welfare recipients.

In deciding whether MHA's policy and practice comport with requirements of due process, the court must "determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." Nebbia v. People of

State of New York, 291 U.S. 502, 536, 54 S.Ct. 505, 515, 78 L.Ed. 940 (1934). On the record here, plaintiffs are highly likely to prevail in their contentions that the MHA policy and practice are discriminatory and so lacking in reasonable basis or relationship to the facts as to violate due process.

As was observed in Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954),

> "The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process."

MHA has discriminatorily shaped its policies to apply to those tenants who receive public assistance rather than to those tenants who may cause MHA financial loss. This arbitrary standard affronts due process.

#### (b) Irreparable harm

Defendant MHA contests plaintiffs' allegations that they are harmed by its practice, asserting that the record does not support the statements that plaintiffs are presently housed in "inadequate" facilities. The argument lacks merit.

In the case of the three named plaintiffs, the record establishes that their present housing is over-crowded, ill-suited for family life, and, as indicated above, suffering from a lack of maintenance. The dislocation of the two named plaintiffs who are fire victims is doubly acute, since they have been effectively denied an opportunity to relocate in permanent housing. No question exists that they could be more adequately, suitably and inexpensively housed in MHA facilities. Whenever constitutional rights as basic as those here asserted are denied, each day's damage is irreparable.

Irreparability as to the class is demonstrated by Exhibit B to Plaintiffs' Memorandum, "Housing Market for Low Income Families in Westchester." This survey indicates that the vacancy rate for apartments in Yonkers was 1.1% for the year 1964, that the number of apartments renting at less than $80 per month was .02% of apartments in Yonkers and of these some 20% are estimated to be sub-standard. Given the large number of persons receiving public assistance in Yonkers, it is a reasonable inference that many of them may be in housing which they can ill afford or which may be sub-standard. Accordingly, a good number may seek public housing and be or become members of the class determined above. The defective requirement that all these persons obtain the Department's co-signature on any leases for public housing works an unacceptable and irreparable hardship on the class.

#### (c) Balance of hardships

It is true that the granting of an injunction here may impose some unrecoverable cost upon MHA. Unfortunate as that may be, the hardship to MHA would be relatively slight in relation to its resources, whereas the failure to grant an injunction would impose on the plaintiffs the deprivation of the fundamental right to decent housing, which is particularly difficult for indigent persons to find, especially in the current Yonkers housing market. The balance of hardships clearly favors the plaintiffs.

#### CONCLUSION

For the reasons set forth above the plaintiffs' motions are granted and the defendants are restrained from refusing to rent to the plaintiffs (or members of the class) apartments within the jurisdiction of defendants on the sole basis

that their leases are not co-signed by the Westchester County Department of Social Services.

The foregoing constitutes the court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Submit order on notice.