Mildred **HARKLESS** et al., Plaintiffs,

v.

The **SWEENY INDEPENDENT SCHOOL DISTRICT OF SWEENY, TEXAS,** et al., Defendants.

Civ. A. No. 66-G-34.

United States District Court, S. D. Texas, Galveston Division.

Jan. 10, 1975.

As Amended Jan. 16, 1975.

Weldon H. Berry, Houston, Tex., Sanford D. Bishop, Jr., Columbus, Ga., and Gabrielle K. McDonald, Houston, Tex., for plaintiffs.

Grant Cook, Reynolds, White, Allen & Cook, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

NOEL, District Judge.

### PREFACE

In the spring of 1965, defendant Sweeny Independent School District (hereinafter called the District) adopted a plan of complete school desegregation and, pursuant thereto, ordered the number of its faculty reduced for the 1966–67 school year. In effecting this reduction, the District did not offer reemployment to seventeen Negro teachers.

On May 23, 1966, twelve of the seventeen filed this suit alleging racial discrimination in the decision not to rehire. Plaintiffs predicated their sole cause of action on 42 U.S.C. § 1983. Jurisdiction was asserted solely under 28 U.S.C. § 1343(3). The claim was brought as a class action on behalf of the twelve named plaintiffs and all others similarly situated, i. e., all Negro teachers not rehired by the District for the 1966–67 school year.

The original named defendants were the District, its superintendent and seven members of its Board of Trustees.

Plaintiffs did not specify whether they were suing the superintendent and the members of the Board of Trustees in their official capacities only, or in their individual capacities as well.[1] The complaint sought injunctive and other relief, including back pay and other allowances lost as a result of the allegedly improper refusal to rehire.

Much of the lengthy history of this case is traced in detail in previous opinions of this Court. Harkless v. Sweeny Independent School Dist., 278 F.Supp. 632 (S.D.Tex.1968) [hereinafter called *Harkless I (Dist.);* Harkless v. Sweeny Independent School Dist., 300 F.Supp. 794 (S.D.Tex.1969) [hereinafter called *Harkless II (Dist.)*]. In the interest of brevity, only the following summary is provided here.

Extended discovery and numerous pretrial conferences were necessary throughout this case. Early in the proceedings this Court held that the alleged class of plaintiffs was not so numerous as to make it impractical to bring all persons included therein before the Court individually. Accordingly, the case was stripped of its character as a class action on April 21, 1967.

In November, 1967, plaintiffs sought and were granted leave to amend their complaint. Defendants responded with an amended answer and requested a jury trial. On January 19, 1968, the Court held in *Harkless I (Dist.)* that the case was a proper one for a jury. Plaintiffs moved to dismiss their amended complaint insofar as it raised any jury issue and asked that the case be transferred to the non-jury docket. These requests were denied by the Court on June 6, 1968.

In March of 1969 the case proceeded to a trial by jury. During the course of the voir dire examination, plaintiffs moved for clear and obvious reasons of strategy to dismiss all claims they might have had against the individual defendants in their individual capacities. This motion was granted and plaintiffs' second amended complaint resulted. With only the District and its officers as such remaining as defendants,[2] the Court requested the parties to submit briefs on the relevance of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) to the question of whether the remaining defendants were "persons" within the meaning of 42 U.S.C. § 1983. This question was carried with the case.

On March 13, 1969, the jury returned its verdict on special interrogatories. The jury's findings were uniformly favorable to the defendants[3] with one exception: the jury found that "a factor relied upon by the board [of trustees] in not offering reemployment to seven of the plaintiffs was the fact that these particular plaintiffs were parties to this lawsuit."

Plaintiffs then sought and received leave to further amend their complaint to incorporate a ground of recovery consistent with the jury's verdict. Numerous other motions were not acted upon because the Court, relying on Monroe v. Pape, supra, determined that the plaintiffs had failed to state a claim upon which relief could be granted. See *Harkless II (Dist.)*.

The Court of Appeals for the Fifth Circuit reversed this holding saying that claims for equitable relief were not within the rule of *Monroe.* Harkless v. Sweeny Independent School Dist., 427

---

1. Although references to the "defendant Board" can be found throughout the substantive allegations of plaintiffs' original complaint and each successive amended complaint, it is clear that the Board of Trustees as a separate legal entity was never a party to this lawsuit. The matter is, further, of no moment, for the Board as an entity would have the same status as the defendant District. Cf. Johnson v. Hackett, 284 F.Supp. 933 (E.D.Pa.1968).

2. As this case progressed, there were periodic changes in the number and identity of the parties before the Court. The disposition of this case described herein renders it unnecessary to record in detail the changes which occurred.

3. The full verdict of the jury is quoted in *Harkless II (Dist.)*, 300 F.Supp. at 799.

F.2d 319 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971) [hereinafter called *Harkless III (Cir.)*]. The opinion of the majority limited *Monroe* to suits for damages and found that the plaintiffs here sought the equitable relief of reinstatement and back pay only. The majority also expressly concluded that § 1983 contemplated equitable relief against individuals sued in their official or representative capacities. Finally, the Court of Appeals held that the opinion of this Court expressed in *Harkless I (Dist.)* was incorrect—that "a claim for back pay presented in an equitable action for reinstatement authorized by § 1983 is not for jury consideration . . .." *Harkless III (Cir.)*, 427 F.2d at 324.

On remand, counsel for both parties stipulated, at the request of the Court, that the case could be decided on the record created by the jury trial supplemented by evidence adduced at hearings held before the Court in January and April, 1972. Upon the receipt of comprehensive post-trial briefs, the Court took the case under consideration.

In June, 1973, the Supreme Court handed down its decision in City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). In that case, Justice Rehnquist, speaking for an eight-man majority, concluded that municipal corporations were outside the ambit of § 1983 for purposes of equitable relief as well as for damages. Thereafter, this Court directed counsel to submit memoranda on the application of that decision to this case.

The parties have now been heard at length on this question. The issues have been briefed and ample time for submission of supplemental memoranda has been allowed. As part of their reaction to *City of Kenosha*, supra, plaintiffs have sought leave to amend their complaint to include as defendants the superintendent and certain members of the Board of Trustees of the defendant District in their individual capacities.

Plaintiffs have also persuasively presented to this Court a request for a decision which will avoid where possible the need for a time-consuming remand of this case in the event of a successful appeal by either party. For this reason, the opinion which follows will present alternative grounds in support of the final judgment of this Court. The Court must, however, decline the opportunity to render hypothetical judgments.

## I. THE CONSEQUENCES OF CITY OF KENOSHA

### A. THE DEFENDANT SWEENY INDEPENDENT SCHOOL DISTRICT

In response to the Court's requests for memoranda of law on the applicability of *City of Kenosha*, supra, to this case, all defendants have moved for dismissal of this action for failure to state a claim upon which relief may be granted.[4] They urge as a defense the same legal position taken by them when this Court ruled in their favor in *Harkless II (Dist.)*. But the Court of Appeals, in *Harkless III (Cir.)*, reversed this Court's ruling. The decision of the Court of Appeals—that the District and the individual defendants sued in their representative capacities were "persons" within the meaning of § 1983—has now become the "law of the case". Cf. 1B Moore's Federal Practice ¶ 0.0404[10].

---

4. Defendants' motion to dismiss for failure to state a claim under 42 U.S.C. § 1983 also states grounds for a dismissal for lack of jurisdiction under 28 U.S.C. § 1343(3). This is due to the peculiar language of § 1343. That section introduces its subsections with these words:

"The district courts shall have original jurisdiction of any civil action *authorized by law* to be commenced by any person:" (emphasis supplied)

If a plaintiff fails to state a claim, there no longer exists a "civil action authorized by law" under § 1343. In this manner, the peculiar language of § 1343 automatically converts a failure to state a claim into a jurisdictional defect.

In *City of Kenosha*, the majority relied upon this jurisdictional implication of their decision to justify deciding the case on a point neither party had raised. See 412 U.S. at 511, 93 S.Ct. 2222.

There is, however, an exception to the "law of the case" doctrine which is well recognized in this Circuit. The doctrine does not apply where "there is an intervening change in the law by authoritative declaration of the authoritative court." Page v. St. Louis Southwestern Ry., 349 F.2d 820, 821 (5th Cir. 1965). The instant case is a classic example of such an intervening change in the law.

The law governing this case changed when the controlling decision of the Court of Appeals for the Fifth Circuit was over-shadowed by the decision of the Supreme Court in *City of Kenosha,* supra. The result has been described by Chief Judge Brown of the Fifth Circuit in Cason v. City of Jacksonville, 497 F.2d 949 (5th Cir. 1974):

> In Harkless v. Sweeny Independent School District, 5 Cir., 1970, 427 F.2d 319 [Harkless III (Cir.)] we distinguished *Monroe* and held that a "municipality"—in that case a school district—was a "person" within § 1983 for the purpose of equitable relief . . . [T]he Supreme Court in City of Kenosha v. Bruno, [citation omitted] rejected the *Harkless* distinction and held that a municipality is not a person within § 1983 whether for damages or equitable relief . . . *Cason,* supra, 497 F.2d at 951.

Plaintiffs have not even contended that the Sweeny Independent School District is not to be treated as a municipality for the purpose of applying *City of Kenosha,* supra. The Court of Appeals has already found in this case that "the school district, under Texas law, is of the nature of a municipality . . . " *Harkless III (Cir.),* 427 F.2d at 321. Since the decision in *City of Kenosha,* the Fifth Circuit has reaffirmed the principle that a Texas school district is "in the nature of" a municipality. Campbell v. Masur, 486 F.2d 554, 555 (5th Cir. 1973).

Now, therefore, it is hereby ordered that plaintiffs' complaint against the defendant District must be and same hereby is dismissed both (a) for failure to state a claim under 42 U.S.C. § 1983, and (b) for lack of jurisdiction under 28 U.S.C. § 1343(3). See note 4, supra.

## B. THE INDIVIDUAL DEFENDANTS SUED IN THEIR OFFICIAL CAPACITIES

As noted above, plaintiffs have also named as defendants the superintendent of the defendant District and certain members of its Board of Trustees in their official capacities. A peculiar niche in our jurisprudence for suits against public officers in their official capacities was carved by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). A few words concerning that decision are necessary here

The Eleventh Amendment provides the states with a constitutional form of sovereign immunity in these words:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[5]

However, the Eleventh Amendment does not mean that our citizens are completely without remedy when their constitutional rights are infringed by state action. In Ex parte Young, the Supreme Court held, despite the Eleventh Amendment, that a federal court had the power to enjoin a state official from enforcing a statute which was in violation of the Fourteenth Amendment. This result was reached by use of the fiction that the officer's unconstitutional activity strips him of his sovereign character so that the activity in question may be enjoined without affecting the state's sovereignty.[6]

---

5. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) held that the Eleventh Amendment protects a State from federal court actions brought by a state's own citizens as well as by citizens of another state.

6. However, "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual of-

This Court will not pause here to elaborate on the logical inconsistencies inherent in the fiction of Ex parte Young.[7] Its doctrine has fairly been termed "indispensable to the establishment of constitutional government and the rule of law."[8] It is a firm part of our jurisprudence.

■ The Eleventh Amendment confers no immunity on the defendant District, nor, perforce, on its officers. Consequently, the rule of Ex parte Young has no direct bearing on this case. The foregoing reference to the rule has been included to clarify the posture of the individual defendants before the Court and, more importantly, to serve as a predicate for the application to the instant case of the teaching of Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974).

This recent decision grew out of a complaint against certain state officials responsible for administering in Illinois the federal-state programs of Aid to the Aged, Blind or Disabled. The relief obtained from the District Court included a monetary award to the plaintiffs of benefits improperly withheld in the past. The Court of Appeals affirmed this retroactive award, terming it a form of "equitable restitution." Jordan v. Weaver, 472 F.2d 985 (7th Cir. 1973).

The Supreme Court reversed the retroactive award on the basis of the Eleventh Amendment, pointing out that such relief

is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pocket[s] of the individual state official[s] who [were] the defendant[s] in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant

state officials. Edelman v. Jordan, supra, 415 U.S. at 668, 94 S.Ct. at 1358.

■ The opinion in Edelman acknowledged the continued vitality of Ex parte Young as a source of federal judicial power to grant prospective injunctive relief, including that which may have an "ancillary effect" on the state treasury. Edelman, supra, 415 U.S. at 668, 94 S.Ct. 1347. But it is now clear that one outer limit has been placed on the fiction of Ex parte Young. When a state official is asked to make a payment directly from the public fisc to compensate for funds improperly withheld in the past, our courts will no longer close their eyes to the fact that such relief is in fact relief against the state.

Returning to the instant case, we see that the "immunity" of the defendant District does not derive from the Eleventh Amendment at all. It derives from the fact that the District is not a "person" within the meaning of 42 U.S.C. § 1983. Strictly speaking, this case · is, therefore, distinguishable from Edelman. But the two cases are not distinguishable in one crucial respect: both concern the proper use of the doctrine of Ex parte Young.

■ This Court can conceive of no rational basis for saying that a suit against a state officer for retroactive monetary relief is actually a suit against the state for purposes of the Eleventh Amendment while also saying that a suit against a municipal officer for retroactive monetary relief is not actually a suit against the municipality for purposes of § 1983. There is a difference, but there can be no distinction in law.

Now, therefore, it is hereby ordered that plaintiffs' prayer for back pay and other lost allowances[9] must be and the same hereby is dismissed.

ficials are nominal defendants." Ford Motor Co. v. Dept. of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

7. Cf. C. Wright, Law of Federal Courts, § 48 (2nd ed. 1970).

8. Id. at p. 186.

9. See plaintiffs' Second Amended Complaint (Document No. 75) Part X, paragraph 3.

Plaintiffs' prayer for reinstatement [10] properly read, constitutes a request that the defendants be enjoined from offering employment to teachers in an unconstitutional fashion and, as a necessary concomitant thereto, that the plaintiffs be offered reemployment by the District. This is a request for prospective injunctive relief which this Court has the power and the duty to pass upon.[11] The Court's findings of fact and conclusions of law on the issues thus presented are stated in full in Part III, infra.

It is appropriate, however, that this Court first speak to plaintiff's Motion to Amend their Second Amended Complaint.

## II. PLAINTIFFS' MOTION FOR LEAVE TO AMEND SECOND AMENDED COMPLAINT.

Perhaps anticipating the limiting effect of *City of Kenosha* on their claim, plaintiffs now move the Court for leave to amend their complaint in the following manner:

1) to expand their jurisdictional allegations to include 28 U.S.C. §§ 1331 and 1343(4), as well as 28 U.S.C. § 1343(3);

2) to expand their allegations pertaining to causes of action to include 42 U.S.C. §§ 1981, 1985 and 1988, as well as 42 U.S.C. § 1983; and

3) to add as defendants the superintendent and five members of the Board of Trustees of the District, with their "successors and assigns", in their individual capacities.

Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires." In the circumstances of this case, however, the amendments requested threaten to achieve substantial injustice.

Plaintiffs' original complaint was not explicit as to the capacity in which the individual defendants were sued. The parties proceeded as if the superintendent and Board members were before the Court individually.[12] During the examination of several jury veniremen, plaintiffs realized there could be severe strategic disadvantages to seeking damages out of the pockets of the individual defendants. Plaintiffs accordingly moved before the jury trial of this

---

10. Id. at paragraph 2.

11. The Court notes the action taken by the Court of Appeals for this Circuit in Jennings v. Patterson, 488 F.2d 436 (5th Cir. 1974). That case was a civil rights action against the City of Dadeville, Alabama and certain city officials, among others. The Circuit Court acknowledged that *City of Kenosha* meant that the plaintiffs had failed to state a claim (cf. note 4, supra) against the city itself. The opinion then continues:

"We remand for consideration by the District Court as to whether, in light of *Kenosha*, mandatory injunctive relief against the city's officials, requiring them to set in motion the city's machinery of government, is proper. *See* Campbell v. Masur, 486 F.2d 554 (5th Cir. 1973)." *Jennings*, supra, 488 F.2d at 441.

Whether this action by the Court of Appeals has any significance for the instant case is unclear. If the quoted statement can be read to mean that certain forms of prospective injunctive relief may overcome the fiction of Ex parte Young, a careful inspection of the full consequences of the prayed-for re-

lief would apparently be called for. Cf. the opinion of the writer in Bush v. Martin, 224 F.Supp. 499, 531 (S.D.Tex.1963) (Noel, J., dissenting), aff'd, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964) to the effect that a decree mandating certain state officials to hold Congressional elections statewide on an at-large basis constituted an exercise of jurisdiction over the state itself in contravention of the Eleventh Amendment, notwithstanding Ex parte Young.

Perhaps new life will be breathed into the principle that "the nature of a suit as one against the state [or municipality] is to be determined by the essential nature and effect of the proceeding." Ford Motor Co. v. Dept. of Treasury of Indiana, supra, 323 U.S. at 464, 65 S.Ct. at 350. But the quoted statement from *Jennings*, supra, is sufficiently cryptic to make this Court hesitant to act in reliance upon it.

12. The opinion of this Court in *Harkless II (Dist.)* reflects the universal assumption that the individual defendants were appearing in their individual capacities. 300 F.Supp. at 795.

claim to dismiss all claims against the District's officers in their individual capacities. The parties agreed that a reference to the stipulated dismissal would be incorporated in the amended pretrial order. Plaintiffs do not, and indeed could not, deny that this action was unequivocal and was taken on their own initiative.

Fed.R.Civ.P. 41(a)(1) provides that "[u]nless otherwise stated in the notice of dismissal or stipulation, [a] dismissal is without prejudice . . ." The peculiar circumstances of the dismissal of plaintiffs' claim against the individual defendants personally left the record with no formal notice of dismissal or stipulation. The "notice" and "stipulation" that were actually approved by the Court were oral. The transcript reveals that the dismissal was intended by the plaintiffs, understood by the defendants and approved by the Court as a dismissal with prejudice. Preferring a practical approach to the application of Rule 41 rather than a mechanistic one, Battle v. Municipal Housing Authority, 53 F.R.D. 423 (S.D.N.Y.1971), this Court concludes that the claim against the individual defendants under § 1983 which plaintiffs now seek to assert was dismissed with prejudice in the spring of 1969.[13] For this reason, the relevant portion of plaintiffs' request to amend must be denied.

If the individual defendants were not fully protected in their individual capacities by the previous dismissal, they would nevertheless not be exposed to plaintiffs' claim. Public officials exercising discretion in the performance of their duties have a qualified privilege which protects them from liability for acts done by them in good faith. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). When arbitrary or capricious behavior or acts of personal vindictiveness on the part of an official are alleged, the official's privilege is unavailing. Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), cert. den., 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). But in this case the pleadings are devoid of a single allegation of activity not protected by this form of immunity. For this reason also, the relevant portion of plaintiffs' request to amend must be denied.[13a]

There is a third alternative reason supporting this Court's decision to disallow plaintiffs' attempt to call the individual defendants to answer personally in this action: a reason which applies as well and with the same result to plaintiffs' request to expand the complaint to include causes of action grounded in 42 U.S.C. §§ 1981, 1985 and 1988. The applicable statute of limitations has expired on plaintiffs' claims under all four of the sections of the Civil Rights Act relied upon. Because the Act contains no statute of limitations specifically applicable to its provisions, the Court must look to the state limitation on causes of action most nearly analogous to the ones presented here. O'Sullivan v. Felix, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914): see generally, Anno., 98 Am.L.Rep.2d 1160 (1964). In this case, the limitations period is four years,

---

13. It is, of course, of no significance that the individual defendants remained before the Court in their official capacities. Changing the capacity in which a party is sued has the effect of adding a new party. Cf. Watson v. Employers Liability Assurance Corp., 202 F.2d 407 (5th Cir. 1953), rev'd on other grounds, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954).

13a. The Court notes that the decision of the Court of Appeals for the Eighth Circuit in Strickland v. Inlow, 485 F.2d 186 (8th Cir. 1973), which is in accord with the principles stated herein, is before the Supreme Court on certiorari at this time. Cf. Wood v. Strickland, No. 73–1285, 43 U.S.L.W. 3371 (U.S., argued Oct. 16, 1974). The delays which have accompanied the resolution of this controversy, together with the seemingly remote possibility that the imminent decision would alter the result here, have led this Court to proceed without awaiting the outcome of the pending case.

as provided in either Vernon's Tex.Rev. Civ.Stat.Ann. Art. 5527 (the contract limitation) or Art. 5529 (the "catch-all" limitation). Guerra v. Manchester Terminal Corp., 350 F.Supp. 529, 532 (S.D.Tex.1972).[14]

■ In view of the foregoing, plaintiffs' request to expand the jurisdictional allegations in their complaint must be denied.

■ Plaintiffs present two imaginative arguments in support of their motion to amend. Plaintiffs' first argument is based on the facts that (a) considerations of strategy in presenting their case to a jury caused them to dismiss claims against the superintendent and Board members in their individual capacities, and (b) the case was initially tried before a jury because of this Court's erroneous conclusion in *Harkless I (Dist.)*, which was reversed in *Harkless III (Cir.)*, that the defendants had a right to a jury trial. Plaintiffs represent that if this Court had ruled correctly on the jury question *ab initio* they would never have been induced to dismiss their claim against the individual defendants in their individual capacities.

In making this argument, plaintiffs apparently subscribe to a "game theory" of justice in which the cardinal rule is that they shall not lose except entirely through their own fault. The "game" plaintiffs propose to play apparently has no rules providing for a res judicata effect on claims dismissed with prejudice, for a qualified official's privilege, or for a statute of limitations.

It is always unfortunate when the rights a client may have are jeopardized by an attorney's decision based on an erroneous view of the law. It is particularly unfortunate when the attorney's decision is inspired by an erroneous decision by a court. But plaintiffs have cited no authority in support of their proposition that the situation must be corrected regardless of the consequences for other parties' rights. While plaintiffs' argument has superficial appeal, it has no merit.

■ Plaintiffs' second argument in support of their motion to amend is grounded on 28 U.S.C. § 1653 which provides that, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Plaintiffs' interpretation of the weaknesses of their claim as being jurisdictional in character was perhaps inspired by the Supreme Court's approach in *City of Kenosha*, see note 4, supra, and by language in recent cases in this Circuit. Campbell v. Masur, supra, 486 F.2d at 555; Sterzing v. Fort Bend Ind. School Dist., 496 F.2d 92, 96, n.2 (5th Cir. 1974).

But, as noted above,[15] there is a unique identity in 28 U.S.C. § 1343 between lack of jurisdiction and failure to state a claim. This identity explains why suits against municipalities can be dismissed on jurisdictional grounds when the root deficiency is, in reality, a failure to state a claim "authorized by law". If the result of plaintiffs' amendment to their complaint would be merely to correct a "defective allegation of jurisdiction" it would present a different issue. But here the effect of the proffered amendment would be to weave a new claim into the fabric of this lawsuit.

Now, therefore, it is hereby ordered that for all of the foregoing reasons, plaintiffs' motion to amend must be and the same hereby is denied in every particular.

The only claim properly before the Court is that brought under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) against the superintendent and certain members of the Board of Trustees of the District, all sued in their official capacities only, for injunctive relief in the nature of re-

---

14. This result obtains even if the running of the statute of limitations was tolled on plaintiffs' claims against the individual de-

fendants in their individual capacities under § 1983 until the spring of 1969.

15. See note 4, supra.

instatement. To a disposition on the merits of that claim we now proceed.

## III. THE MERITS OF PLAINTIFF'S CLAIM

Subject to the foregoing, this Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) follow. The same apply not only to the above articulated claim of plaintiffs for injunctive relief in the nature of reinstatement, but also in the alternative to each claim which this Court hereinabove has ordered dismissed or denied.

### A. FINDINGS OF FACT

(1) Prior to the school year 1965–66, the Sweeny Independent School District operated a racially segregated school system. White students and faculty were assigned to one group of schools, and Negro students and faculty were assigned only to the George Washington Carver School.

(2) During the spring of 1965, and specifically at a meeting held on May 4, 1965, the Board of Trustees (hereinafter called "Board") adopted a two-phase plan of desegregation in prompt response to the guidelines promulgated by the United States Department of Health, Education and Welfare for the desegregation of public schools.

(3) On May 5, 1965, the superintendent of schools for Sweeny distributed to all teaching personnel a memorandum advising that certain steps would soon be taken to bring the District into compliance with the Civil Rights Act of 1964. The memorandum essentially digested the plan formulated at the May 4 meeting of the board. Point (4) in the memorandum was as follows:

> Beginning September, 1966, all twelve grades in the system will be fully integrated, based on assignment by school officials and including the integration of the teaching staff.

(4) The desegregation plan was duly submitted for consideration by the appropriate federal officials. At the Board meeting of September 7, 1965, superin-

tendent Miller reported that the plan had been approved by the United States Office of Education and that implementation could begin.

(5) Thereafter, the District initiated the first phase of the plan, which was (a) that each student be permitted to attend the school of his choice, and (b) that desegregated kindergarten classes be formed, each for the school year 1965–66. The second phase of the desegregation plan, which was to commence in 1966–67, called for the complete desegregation of the system, including abolition of the George Washington Carver School as such, and the employment of all teachers without regard to race. Specifically, the plan provided that teachers, both White and Negro, would be employed for the 1966–67 year in accordance with anticipated need and "strictly on the basis of training, qualification, ability, without regard to race."

(6) During the 1965–66 school year the District consisted of five schools: the primary school (kindergarten through third grade), the intermediate school (grades four through six), the junior high school (grades seven through nine), the senior high school (grades ten through twelve), and the George Washington Carver School (grades one through twelve). All faculty and all students at the George Washington Carver School were Negroes. Students of both races, including sixty-five Negro students, attended the other four schools in the District, but only White teachers taught at these schools. During the 1965–66 school year, the District employed 23 Negro teachers and one Negro principal.

(7) At its meeting of April 5, 1966, the Board approved a more detailed version of phase two of the plan for complete desegregation of the system to be effected September 1, 1966. In regard to faculty, it provided that "[a]ll teachers will be employed and assigned on the basis of ability and qualifications."

(8) In accordance with the desegregation plan adopted the previous year, the District completely integrated its school

system at the start of the 1966–67 school year. The George Washington Carver School was abolished as a Negro school. All students of all races in grades ten, eleven and twelve were enrolled in Sweeny Senior High School. All students of all races in grades seven, eight and nine enrolled in the Sweeny Junior High School. All students of all races in grades four, five and six enrolled in the Sweeny Intermediate School, which was housed in the former George Washington Carver School. All students of all races in kindergarten and in grades one, two and three enrolled in the Sweeny Primary School. In kindergarten and grades one through six, students were assigned to classroom units strictly on the ratio of races existing within a given grade. For example, if twenty-five percent of all fourth grade students were Negro, each fourth grade class contained twenty-five percent Negro and seventy-five percent White students. In all required or basic courses in the higher grades, students were assigned strictly on the racial ratio of each course as in the elementary grades. In order to implement this racial balancing system, a "tracking" system which had previously been employed was abandoned. The racial ratio of elective courses at the secondary level depended, of course, upon which students elected to take them. So far as the evidence discloses, this system of racial balancing as outlined in the desegregation plan and implemented for the first time in 1966–67 has been used every semester since September of 1966. At the time of trial, the District operated four schools serving approximately 2,000 students, of whom about one-fourth were Negroes. It is undisputed that a unitary system has been achieved. Cf. Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S. Ct. 612, 24 L.Ed.2d 530 (1970).

(9) The Court finds that the speed of desegregation in the District, while deliberate, was appropriate. It was accomplished voluntarily and without litigation or judicial compulsion. When appropriate, the approval and cooperation of the United States Department of Health, Education and Welfare was readily obtained. In short, there is no suggestion of bad faith, dilatory tactics, foot-dragging, or intransigent resistance either to desegregation of the District schools, or to this transformation into a unitary system. The latter occurred before the unitary system as such was judicially conceptualized or required by our courts. Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); United States v. Jefferson County Bd. of Educ., 372 F.2d 836 (5th Cir. 1966) (decided Dec. 29, 1966), aff'd & modified en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

(10) Mr. Fred Miller is superintendent of schools in the District and has served in that capacity since 1958. He is an experienced school administrator, having served as superintendent at Littlefield, Texas, from 1944 to 1946, and at Abernathy, Texas, from 1947 to 1958. In his capacity as superintendent, he is the chief administrative officer of the District, charged with executing the policies of the elected Board. All teaching and instructional personnel in the District were then and are now hired by the Board of Trustees upon recommendation of the superintendent, and the Board follows his recommendations in this respect as a matter of course. The Board has never employed anyone except upon the recommendation of the superintendent. All teachers in the District are hired on a year-to-year basis. While the superintendent has at times received longer contracts, no teacher has ever had a contract of more than one year's duration. As state law did not then provide for faculty tenure, there was no seniority tenure plan in the District.

(11) Each year non-teaching professional persons are recommended by the superintendent for reemployment at the regular February meeting of the Board. The superintendent usually presents his recommendations for re-employment of classroom teachers at the regular March

meeting of the Board. He advises the Board as to which annual teaching contracts should be renewed and which should be allowed to expire. New teachers and other personnel are recommended as needed. The Board votes on the recommendations of the superintendent at the meeting in which they are presented.

(12) The superintendent bases his recommendations for reemployment of classroom teaching personnel on a system of teacher evaluation. Separate evaluations are made of each teacher in the system by his or her principal, the curriculum director, and the superintendent. During the period when the District operated a dual system as well as during the transitional 1965–66 school year, White teachers were rated and compared only with other White teachers, and Negro treachers, only with other Negro teachers. As a result of the desegregation plan prepared by superintendent Miller, promulgated by the Board and approved by the United States Department of Health, Education and Welfare, the teacher evaluation process used in the spring of 1966 for evaluation of all teachers to be recommended for reemployment for the 1966–67 term, differed from previous evaluations. For the first time, each teacher in the District was evaluated and compared with all other teachers, both Negro and White, without regard to race. It should be noted, however, that the Department of Health, Education and Welfare had neither promulgated nor specified guidelines with respect to the technique of teacher evaluation to be employed.

(13) The evaluation process undertaken in the spring of 1966 was especially critical because a staff requirements study ordered by superintendent Miller indicated that there would be at least twelve fewer teaching positions in 1966–67 than there were in 1965–66. It was expected that the District would need four fewer elementary teachers and eight fewer teachers at the secondary level. This anticipated reduction of staff was thought necessary to eliminate duplication resultant from unitization. It turned out that this projection was a substantial overestimate, as the actual net reduction for 1966–67 was only four faculty positions. However, the Court is satisfied that this was an honest miscalcuation and that defendants, in the spring of 1966, were under the sincere impression that the faculty complement would have to be pared by twelve positions for the ensuing school year.

(14) One method of faculty evaluation employed in the District involved the preparation by building principals of an evaluation form published by the Steck Company of Austin, Texas. Designated as Steck Form 3528, this instrument is composed of a list of thirty-eight characteristics [16] which are generally deemed to be desirable in a teacher. These characteristics are grouped under seven general headings, to-wit: "Personal Qualities", "Teaching Ability", "Routine and Physical Conditions", "Discipline", "Cooperation", "Professional Growth", and "Social Efficiency." Opposite each characteristic there is a scale by which the evaluator can grade the teacher as "Excellent", "Good, above the

---

16. At the top of the form is a blank for the name of the teachers to be evaluated and the subject taught. There follows a list of thirty-eight characteristics, to-wit: Appearance; Health; Enthusiasm and optimism; Initiative and self-reliance; Resourcefulness; Sympathy; Self-control; Tact; Industry; Intellectual ability; Use of English; Organization of subject matter; Preparation for the lesson; Stimulation of thought; Securing pupils' participation; Utilization of pupil's interest; Skill in questioning; Skill in drills; Passing and moving in rooms; Use of simple signals; Careful use of supplies; Heat, ventilation, and light; Control of Class through good teaching; Control of class through good routine; Ability to handle extreme cases; Character building; Cooperation with superiors; Cooperation with other teachers; General attitude towards criticism; Use of professional books and magazines; Other books and magazines; Summer schools, correspondence, etc.; Interest and cooperation in community affairs; Cooperation with parents; Selection of friends; Social affairs secondary to work; Social judgment, "manners"; Conversation, poise and meeting people.

average", "Fair or average", "Poor, or below the average", and "Unsatisfactory". The Steck Form has been used by the District for many years.

(15) On March 1, 1966, superintendent Miller sent to each principal in the District a confidential memorandum in which he requested that teacher ratings be submitted on or before March 7, 1966. In addition to requiring the regular Steck evaluation procedure described above, the superintendent requested that the principals inscribe an additional evaluation or rating, on the first page of each teacher's Steck Form, which he designated an "overall" rating. This method of rating, devised by the superintendent, was to be computed on a "2 to 10" scale and expressed in the following manner:

| | | |
|---|---|---|
| 10 | E | Excellent (as good as the best you have experienced) |
| 9 | E− | |
| 8 | G+ | |
| 7 | G | Good (above average) |
| 6 | G− | |
| 5 | F+ | |
| 4 | F | Fair or average |
| 3 | P | Poor |
| 2 | U | Unsatisfactory |

The rating was for convenience only, to be placed on the Steck Form.

(16) The White principals prepared the evaluations on the Steck Form, as well as the overall rating, as requested. As the principal of the all-White elementary school was seriously ill, she was unable to comply and the evaluations from the previous year had to be used for her teachers. Principal Edward Gee of the all-Negro Carver school likewise prepared the forms and overall rating as requested and returned them to superintendent Miller. Gee prepared such an evaluation and rating for all plaintiffs except Florence Jones, who was not evaluated in the regular manner because she was a substitute teacher employed on a non-contract basis.

(17) Curriculum director C. W. New and superintendent Miller also prepared overall numerical ratings for each contract teacher in the District, including all of the plaintiffs except Florence Jones. These ratings were assigned on the basis of the scale described in finding of fact (15), supra. Neither the curriculum director nor the superintendent prepared a Steck Form for the teachers.

(18) As to each teacher, the overall numerical ratings of the respective principals, the curriculum director and the superintendent were added to produce a composite overall rating for each teacher. This composite rating formed the basic means of comparison by which the superintendent made his critical decision to recommend retention or separation in the case of each plaintiff.

(19) Plaintiffs have levied a vigorous attack on the validity of defendants' teacher evaluation technique, i.e., the use of the Steck Forms and the overall numerical ratings. Crucial to this attack was the interesting and informative expert testimony of Professor E. Edmund Reutter, Jr., of Columbia University, an authority on the subject of staff personnel administration in the public school setting. While lacking practical administrative experience in the field of public school administration, Dr. Reutter is clearly qualified as a theoretician, author and lecturer in the field. Prior to testifying, Dr. Reutter had been afforded an opportunity to familiarize himself with the evaluation devices used by the District, and to form an opinion as to the degree of their perfection. This opinion was unfavorable.

Dr. Reutter commenced his testimony by postulating that the ultimate purpose of a personnel decision to some extent affects the choice of evaluating mechanisms. He observed that the more serious the human consequences—such as possible termination—the more carefully the instruments of measurement should be wielded. In achieving the desired precision, Dr. Reutter posited it is initially necessary to determine *what* is to be evaluated and to define the criteria which are relevant. For example, if the quality to be measured is pedagogical efficiency, then only those characteristics reasonably related to that qual-

ity may appropriately be considered. Having isolated the relevant areas of inquiry, Dr. Reutter posited that it then became necessary to construct an evaluative device which is as objective as possible. By objectivity, he explained, is meant that the outcome of the evaluation should be determined to the greatest possible degree by the neutral characteristics of the evaluatee and to the smallest possible degree by the emotional feelings, personal predilections, or subjective preferences of the evaluator. Presumably, objectivity is attained when similarly qualified evaluators, applying similar criteria to similar subjects, reach similar results. Dr. Reutter emphasized that in his opinion the achievement of objectivity rests upon three "pillars": (1) the language employed in the evaluative instruments to describe each characteristic to be measured must be composed of words which are reasonably precise and uniform in meaning; (2) there must be a fairly specific standard of measurement to guide the evaluator in ascribing a particular value to a particular characteristic; and (3) there must be a reasonably well defined system for assigning relative weight to the characteristics measured. To implement these three pillars of objectivity and thereby enhance evaluative perfection, Dr. Reutter insisted upon coincidence of the following procedural refinements in the process: (1) each *evaluator* should be trained in personnel evaluation generally and in the use of the particular evaluative instrument which is to be used; (2) *several* of these trained eval-

uators should be employed *for each criterion or characteristic;* (3) there should be *several evaluations* with respect to each characteristic over a continuum of time; (4) the *several evaluators* should reach and record their conclusions independently; (5) *all evaluations* should be based on *first-hand observations* of that which is being evaluated; and (6) *all evaluations* should be *recorded* without delay along with *supporting evidence* to justify the result.[17]

In virtually all of the foregoing respects, Dr. Reutter opined that the District's method was deficient. If the issue in this suit were only whether the method used conformed to the mechanical requirements postulated by Dr. Reutter, the Court would be inclined to agree that variances did exist. However, the Court cannot agree that full compliance with the six procedural refinements postulated by Dr. Reutter is requisite to a constitutionally acceptable (racially non-discriminatory) evaluation of the District's teachers. To the contrary, the Court is of the opinion the teacher evaluation procedures employed by the District in the spring of 1965 were not unfair, biased, or fatally subjective because they did not conform in all respects to the six procedural postulations of plaintiffs' expert.

If one thing is clear in the area of public school personnel administration, it is that the subject of teaching personnel evaluation is a controversial and volatile one upon which very little uniformity of professional opinion exists.[18]

17. It should be noted that Dr. Reutter pointed to no authority to which the District might have turned and found the precise procedures he outlined recommended. Collectively, the refinements listed in the text are the products of Dr. Reutter's after-the-fact consideration of the problem facing the District.

18. "Probably no aspect of education has been discussed with greater frequency, with as much deep concern, or by more educators and citizens than has that of teacher effectiveness— how to define it, how to identify it, how to measure it, how to evaluate it, and how to detect and remove obstacles to its achieve-

ment. Separate facets of this problem have been studied, too, by state and local school systems, by individuals, and by teams of educational researchers at universities. But findings about the competence of teachers are inconclusive and piecemeal; and little is presently known for certain about teacher excellence. . . .

"It is not an exaggeration to say that we do not today know how to select, train for, encourage, or evaluate teacher effectiveness. And many educational researchers have abandoned the field of competence research as a simple-minded approach to a vastly more com-

This rather confused state of the art was conceded by Dr. Reutter and is borne out by a representative sampling of the literature prepared by qualified authors in the field.[19] The learning is consistent in recognizing that there are several general approaches to teacher evaluation which are now prevalent and that some methods are more appropriate for a given purpose than others. However, careful consideration of the literature makes manifest that there is no general consensus and that the authorities do not agree that a particular method of evaluation is either absolutely mandatory or totally unsatisfactory for any purpose.

This divergence of viewpoint was dramatized by Dr. Reutter's skeptical attitude toward the efficacy of the simple checklist and numerical rating methods used by defendants in the instant case. Although he presented an articulate and powerful theoretical critique of these methods, the facts are inescapable that the checklist and numerical methods are the earliest forms of evaluative tools, and are currently in widespread use among practical educators throughout Texas. They have found considerable acceptance by practitioners generally. Checklist forms similar in conception to the Steck Form are so recognized by the literature and are commonly employed by school districts across the country. See, e.g., H. Davis, "Evolution of Current Practices in Evaluating Teacher Competence," in *Contemporary Research on Teacher Effectiveness*, 41–62 (B. Biddle and W. Ellena ed. 1964). This record contains as exhibits examples of checklist evaluation forms used by several neighboring school districts, all of which are similar in approach to the Steck Form. Defendants elicited the testimony of Mr. W. W. Thorn, an experienced school adminis-

plex topic: the study of class-room interaction. . . .
"Such dismal results provide little comfort for the school administrator, who is confronted with everyday, real problems in the field of teacher excellence. Practical decisions have to be made, and these decisions are dependent upon ideas about quality of teaching. For example, applicants for teaching positions must be screened, prepared, and judged. Teachers must be employed, assigned, transferred, and occasionally released. Problems such as these do not await definitive answers." B. J. Biddle & W. J. Ellena, *Contemporary Research on Teacher Effectiveness* v–vi (1964).

19. Prior to the completion of the supplemental hearings, the Court was desirous of informing itself to some rudimentary degree on the subject of teacher evaluation so that it might better assimilate and appreciate the content of the expert testimony. Toward this end, the Court collected a limited but representative sampling of the rather extensive literature on the subject. By a letter, all counsel were advised of the Court's endeavors in this respect and were invited to inspect in the Clerk's office excerpts from the literature which the Court found of interest. Plaintiffs' expert, Dr. Reutter, was conversant with all of the works and articles consulted. At the supplemental hearing, he testified that the following were professionally respected works in the field: W. S. Elsbree & E. E. Reutter, Jr., *Principles of Staff Personnel Adminis-* *tration* (1959); W. S. Elsbree & E. E. Reutter, Jr., *Staff Personnel in the Public Schools* (1954); H. E. Remmers, "Rating Methods in Research on Teaching", in *Handbook of Research on Teaching* (N. L. Gage, ed. 1963); S. Brighton, *Increasing your Accuracy in Teacher Evaluation* (1965); B. J. Biddle, "The Integration of Teacher Effectiveness Research" and H. Davis, "Evolution of Current Practices in Evaluating Teacher Competence", both in *Contemporary Research on Teacher Effectiveness* (B. J. Biddle & W. J. Ellena, ed. 1964); D. E. Beecher & M. E. Troyer, *The Evaluation of Teaching* (1949); L. S. Vander Werf, *How to Evaluate Teachers and Teaching* (1960); H. E. Moore & N. B. Walters, *Personnel Administration in Education* (1955).

One pamphlet examined by the Court, *Better Than Rating* (1960), is a publication of the Commission on Teacher Evaluation of the Association for Supervision and Curriculum Development, National Education Association. Although this pamphlet is informative as to the various procedures presently employed for teacher evaluation, Dr. Reutter pointed out that it is primarily a polemic reflecting its sponsors' opposition to merit rating.

The Court also consulted J. M. Hughes' *Human Relations in Educational Organization* (1955). Dr. Reutter described the latter work as a sort of overview taken at the end of the author's long and distinguished career, rather than an academic study of the subject.

trator and presently superintendent of the nearby Aldine Independent School District, to the effect that the checklist method of teacher evaluation is commonly employed and generally deemed reliable by practicing educators in Texas. Mr. Thorn also testified that the overall numerical rating device is not an unusual method and could be understood and effectively employed by a reasonably competent school principal or administrator.

■ It is within neither the province nor the competence of this Court to attempt to resolve the ongoing controversy over the advisability of teacher rating and the relative effectiveness of the various techniques used for that purpose. It may well be that an elaborate and complex evaluative procedure such as that advocated by plaintiffs is an enlightened and perhaps even ideal desideratum of efficient faculty personnel administration. It is interesting to note, however, that nowhere in the literature examined by the Court is there recommended precisely or substantially so, such an evaluative program as that offered by plaintiffs. Although intriguing, the point is not presented for decision, for the question before the Court is not whether the District practiced perfect, or even good, techniques of managerial decisionmaking. It is, rather, whether the District practiced racial discrimination in such decisionmaking. At the very most, plaintiffs have proven that the District failed to adopt plaintiffs' view of sound personnel management. There has been no proof that the District's approach was arbitrary, capricious or racially biased.

In sum, the Court finds that the Steck Form and the numerical overall rating methods used by defendants for evaluation and comparison of faculty members in March of 1966 were consistent with at least one professionally accepted and reasonably defensible view of school personnel administration, were a fair measure of professional qualification, were applied evenhandedly to all incumbent contract faculty members, and were not racially discriminatory in intent, application or result.

· (20) Plaintiffs' attack on the professional acceptability of the District's evaluation program having been rejected, some note should be taken of an apparent effort on the part of plaintiffs to demonstrate that the superintendent harbored racially biased attitudes which colored his actions and decisions. This effort was conducted primarily through innuendo, including the absurd inference that the superintendent's place of birth, being West Texas, automatically impugns his capacity for fairness in racial matters. Suffice it to say that this record contains absolutely no evidence of racist attitudes on the part of the superintendent. To the contrary, Miller testified in response to specific questions by plaintiffs' counsel on cross-examination that his recommendation with respect to each plaintiff was not motivated by plaintiffs' race. The Court deems this testimony credible and so finds.

(21) In addition to the Steck Forms and the overall numerical ratings, superintendent Miller requested curriculum director New to prepare informal anecdotal evaluations on each of the Carver faculty members. No similar anecdotal evaluations were prepared at this time on White teachers. At trial, the superintendent testified that because he wished to be prepared for possible controversy arising from complete desegregation at the start of the 1966–67 school year, he asked New to prepare the anecdotal evaluations to assist him in defending or criticizing the Carver faculty members if the need arose. The superintendent did not recall the precise date upon which these evaluations were submitted to him but he testified that he did not use them as a basis for preparing his recommendations for the March meeting. The credibility of this testimony was vigorously attacked. The Court accepts the superintendent's version.

The superintendent's inability to recall the details of the matter, which the Court finds credible, suggests that the

superintendent's reliance upon the anecdotal evaluations, if any, was minor. The Court is persuaded that the New narratives were conceived with a view toward assisting the superintendent in coping with possible desegregation trouble—a contingency which fortunately never materialized—and were not intended to be an element in the evaluation process.

The curriculum director's anecdotal evaluations themselves are not models of diplomatic composition. However, they are highly descriptive and, to the extent that race is mentioned, they are not insulting and they are not irrelevant to the superintendent's purpose of preparing for desegregation. Although Dr. Reutter testified that the anecdotal approach should be used with caution, he correctly pointed out that it is an accepted method of evaluation. Indeed, one sample rating form to which Dr. Reutter gave his qualified approval (the Ohio Teaching Record Anecdotal Observation Form),[20] employs a variation of the technique.

(22) The March 1966 numerical ratings of the Carver faculty, with the exception of Florence Jones are as follows:

| Teacher | Prin. | Curr. Dir. | Supt. | Comp. |
|---|---|---|---|---|
| Plaintiffs | | | | |
| 1. Velma Shelby | 7 | 4 | 4 | 15 |
| 2. Lillian Jammer | 5 | 2 | 2 | 9 |
| 3. Yarbough Kennedy | 7 | 2 | 3 | 12 |
| 4. Robert Woodard | 5 | 2 | 2 | 9 |
| 5. Mildred Harkless | 6 | 2 | 3 | 11 |
| 6. Alice Mae Jones | 6 | 3 | 2 | 11 |
| 7. B. F. Leviston | 5 | 1 | 2 | 8 |
| 8. John P. Jones | 4 | 2 | 2 | 8 |
| 9. W. L. Dotson | 6 | 3 | 4 | 13 |
| Non-Plaintiffs Not Reemployed | | | | |
| 1. Sallie Mae Woodard | 7 | 3 | 4 | 14 |
| 2. Hazel Higgins | 8 | 3 | 4 | 15 |
| 3. Huretta Larkin | 8 | 4 | 4 | 16 |
| 4. Eugesia Lowe | 8 | 4 | 5 | 17 |
| 5. Claudia Wilson | 8 | 2 | 4 | 14 |
| 6. Mary Alexander | 5 | 1 | 2 | 8 |
| 7. Elijah Childers | 6 | 4 | 4 | 14 |
| 8. H. A. Simien | 6 | 4 | 5 | 15 |
| Teachers Reemployed | | | | |
| 1. Margaret Gee | 8 | 5 | 6 | 19 |
| 2. Cleo Grimes | 8 | 6 | 8 | 22 |
| 3. Tena Simien | 9 | 6 | 6 | 21 |
| 4. Booker Holbert | 7 | 5 | 6 | 18 |
| 5. Edward Smith | 6 | 5 | 6 | 17 |
| 6. Janis Hadnott | 6 | 6 | 5 | 17 |

(23) Although the above ratings were assigned on a faculty-wide basis without regard to race, it is interesting to note that *each* of the six reemployed Negro teachers scored higher than *any* of the nine plaintiffs. Additionally, each of the six reemployed Negro teachers scored higher than, or as high as, the highest scoring of the non-plaintiffs who were not reemployed. Therefore, on the basis of the composite score and without regard to teaching fields, it is apparent that the Negro teachers who were reemployed composed six of the seven most professionally competent members of the Carver staff. Conversely, of the seventeen Negro teachers who were not reemployed, both plaintiffs and non-plaintiffs, sixteen were less professionally competent than the least competent of the six Negro teachers who were reemployed. It appears from the foregoing that the selection of the six Negro teachers to be reemployed from the Carver faculty was made on the basis of legitimate good faith, professional judgment, and reflected a sincere desire on the part of defendants to retain the best personnel that Carver had to offer.

(24) The previous finding is supported by plaintiffs' Exhibit No. 396, which is another roster of Carver faculty. In addition to the composite scores heretofore dealt with, this exhibit contains a *ranking* assigned to each Carver teacher by his principal, curriculum director and superintendent. As there are twenty-three Carver teachers considered, each teacher was assigned a number from 1 to 23 in the order of descending competence. The three rankings were then added to produce a composite ranking—the lower numbered teachers being the most competent. On this basis, the five lowest numbered Carver teachers were among the six Carver teachers who were reemployed. Although the probative force of this ranking is weakened by the fact it was applied to the Carver faculty but not District-wide, the nearly perfect correlation between the Carver-wide rankings and the District-wide numerical overall

20. Published by the College of Education, Ohio State University (2d ed. 1945).

evaluations *does reinforce the validity of the latter.* It serves to confirm the predictable phenomenon that the group of Carver teachers who were reemployed on the basis of the District-wide evaluation were also the best teachers at Carver.

(25) In determining which teachers would be recommended for reemployment during the 1966–67 school year, the qualifications of each incumbent teacher were measured against those of every other incumbent teacher in the same grade/subject-matter area. For the first time in the history of the District, this was done on an all-faculty basis without regard to race. Employing the numerical overall ratings assigned to each teacher by interracial groups, a schematic reconstruction of this comparison produces the following results and finding of the Court: [21]

(a) First Grade Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Alice Mae Jones | 6–3–2 | 11 |
| (2) Others: | | |
| V. Arrington | 8–6–9 | 23 |
| C. Cossey | 8–5–10 | 23 |
| C. Rudd | 9–9–10 | 28 |
| P. Walker | 7–4–9 | 20 |

Finding: Alice Mae Jones was the least qualified of the members of the relevant interracial group.

(b) Fifth Grade Teachers:

| | | |
|---|---|---|
| (1) Plaintiff John P. Jones | 4–2–2 | 8 |
| (2) Others: | | |
| M. Doolen | 7–9–6 | 22 |
| E. New | 8–9–7 | 24 |
| D. Stewart | 7–8–7 | 22 |
| E. Vaughn | 8–7–7 | 22 |
| E. Whittet | 8–9–5 | 22 |

Finding: John P. Jones was the least qualified of the members of the relevant interracial group.

(c) Sixth Grade Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Robert Woodard | 5–2–2 | 9 |
| (2) Others: | | |
| M. Gill | 7–9–6 | 22 |
| J. Marsh | 6–6–4 | 16 |
| M. Maxwell | 9–9–7 | 25 |
| E. Smith | 8–7–4 | 19 |

Finding: Robert Woodard was the least qualified of the members of the relevant interracial group.

(d) Science Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Yarbough Kennedy | 7–2–3 | 12 |
| (2) Others: | | |
| M. Wood | 6–4–4 | 14 |
| E. Andrews | 9–9–7 | 25 |
| G. Sparkman | 8–7–4 | 19 |
| M. Rainey | 6–6–4 | 16 |

Finding: Yarbough Kennedy was the least qualified of the members of the relevant interracial group.

(e) History-P.E.-Science Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Lillian Jammer | 5–2–2 | 9 |
| (2) Others: | | |
| J. Pantalone | 7–8–3 | 18 |
| E. Neptune | 8–7–5 | 20 |
| J. Spheeris | 7–8–6 | 21 |
| P. Boazman | 6–5–4 | 15 |
| E. McKinney | 8–9–6 | 23 |
| C. Spano | 8–7–6 | 21 |
| M. Wood | 6–4–4 | 14 |
| E. Andrews | 9–9–7 | 25 |
| G. Sparkman | 8–7–4 | 19 |
| M. Rainey | 6–6–4 | 16 |
| E. Schuchardt | 9–10–8 | 27 |
| D. Boazman | 7–7–4 | 18 |
| G. Hastings | 6–7–4 | 17 |
| F. Dailey | 8–9–7. | 24 |
| R. Swan | 8–8–6 | 22 |

Finding: Lillian Jammer was the least qualified of the members of the relevant interracial group.

(f) History-Band Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Benjamin Leviston | 5–1–2 | 8 |
| (2) Others: | | |
| H. Spencer | 7–7–6 | 20 |
| D. Boazman | 7–7–4 | 18 |
| E. Schuchardt | 9–10–8 | 27 |
| G. Hastings | 6–7–4 | 17 |
| F. Dailey | 8–9–7 | 24 |
| R. Swan | 8–8–6 | 22 |

Finding: Benjamin Leviston was the least qualified of the members of the relevant interracial group.

(g) Homemaking Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Velma Shelby | 7–4–4 | 15 |
| (2) Others: | | |
| H. Tillman | 8–7–6 | 21 |
| C. Maples | 9–9–7 | 25 |

Finding: Velma Shelby was the least qualified of the members of the relevant interracial group.

(h) Shop Teachers:

| | | |
|---|---|---|
| (1) Plaintiff Willie Dotson | 6–3–4 | 13 |
| (2) Others: | | |
| F. Gill | 6–5–4 | 15 |
| C. Stockton | 9–9–6 | 24 |

Finding: Willie Dotson was the least qualified of the members of the relevant interracial group.

21. In the District at the time in question, it was evidently not uncommon for teachers of both races to be assigned to teach a grade or subject other than that for which they might be best qualified in terms of "paper" qualifications such as state certification or number of preparatory semester hours. This is attributable to a number of factors, including administrative convenience, legitimate differences of opinion about the substantive content of preparatory courses as described on college transcripts, and the occasional unreliability of state certification classifications as indicia of subject-matter competence. Therefore, for the purpose of comparing teachers, the fairest manner in which to structure the comparison groups is by grade or subject-matter actually taught in 1965–66 rather than by certification, college major, or the like.

(i) Commercial-History Teachers:

| | | | |
|---|---|---|---|
| (1) Plaintiff Mildred Harkless | | 6–2–3 | 11 |
| (2) Others: | | | |
| | B. Cooper | 7–7–6 | 20 |
| | B. Spencer | 8–8–6 | 22 |
| | J. Swan | 9–9–7 | 25 |
| | E. Schuchardt | 9–10–8 | 27 |
| | D. Boazman | 7–7–4 | 18 |
| | G. Hastings | 6–7–4 | 17 |
| | F. Dailey | 8–9–7 | 24 |
| | R. Swan | 8–8–6 | 22 |

Finding: Mildred Harkless was the least qualified of the members of the relevant interracial group.

(26) The highest scorer among plaintiffs was Velma Shelby, with a composite rating of 15. Willie Dotson was second in the plaintiff group, with a 13. Six of the teachers of both races who were reemployed were also within this 13–15 range (two 13's, one 14 and three 15's). However, neither Shelby nor Dotson equalled or surpassed their reemployed counterparts in the same grade/subject-matter area. It can be seen from the data collected in the foregoing finding that each of plaintiffs, with the exception of Florence Jones who was not rated, ranked lowest among his respective grade/subject-matter interracial grouping. To avoid the rather damaging impact of this showing, plaintiffs strenuously challenged the validity of the evaluation methods which defendants employed through the opinion testimony of Dr. Reutter, supra. For the reasons stated in finding of fact (19), supra, this challenge must be rejected.

 Additionally, however, plaintiffs contend that the result would necessarily have been different if only precisely quantifiable mechanical criteria had been used to guide the employment decision, i. e., level of state certification, semester hours of background in the subject taught, years of teaching experience, and years of experience in the District. These are commonly described and referred to as "paper" qualifications, and were so described in the literature, as well as by the expert witnesses and all counsel at trial. It is true that each of plaintiffs has a record superior to that of certain of the retained or newly-hired White teachers, if the measurement is confined to their paper qualifica-

tions. For illustrative purposes, Plaintiffs' Exhibit No. 398, prepared by plaintiffs' expert witness, Professor Howard L. Simmons, is a collation of data demonstrating that each of plaintiffs surpasses at least two White counterparts in these respects. However, the demonstration is immaterial, for the scope of the inquiry is not properly limitable to the sort of paper qualifications upon which plaintiffs rely. Were this the case, teacher evaluation would amount to nothing more than adding up years of service and semester hours. As Professor Reutter pointed out, such a simplistic approach is utterly unjustifiable if there is better data available. In the instant case, the better available data was in the form of the District's teacher evaluations discussed above. Accordingly, the Court finds that defendants, in comparing teachers for the purpose of retention, properly placed greater weight on evaluations of overall competence than on paper qualifications such as transcript semester hours, state certifications, and longevity.

(27) At the Board meeting of March 8, 1966, superintendent Miller submitted to the Board the names of teachers recommended for reemployment in the 1966–67 school year. The recommendations were based upon a complete evaluation of all instructional personnel presently serving in the District, without regard to race. Eighty-two teachers of both races were recommended for contract renewal at this time, and the Board unanimously approved all recommended renewals. It was noted in the Board's minutes that "additional instructional personnel will be considered at a later meeting. Those to be considered will include persons on a maternity leave, teachers new to the system, and possibly other teachers not recommended at the March meeting."

(28) All White teachers who taught during the school year 1965–66 were offered contracts for 1966–67. Of the twenty-three Negro teachers employed at Carver during 1965–66, six were offered contracts for 1966–67, and the remaining seventeen were not offered new contracts.

In addition to the six Negro teachers retained, the former principal of Carver, a Negro, was also retained in a teaching capacity, thus making a total of seven Negroes retained.

(29) Seven White teachers who were serving during 1965–66, and who were renewed in March of 1966, resigned before the commencement of the 1966–67 school year. They were all replaced by Whites. Three White teachers either resigned or took maternity leave during the 1965–66 school year and were replaced by Whites, all of these replacements being reemployed for 1966–67. At various times subsequent to the March board meeting, approximately six new faculty positions were added, and filled by Whites. All teachers newly hired for the 1966–67 school year were White. The principal of the White elementary school died during the 1965–66 school year and was replaced for the 1966–67 year by an incumbent White teacher. Many of the newly hired White personnel were less qualified than one or more plaintiffs in terms of paper qualifications alone. However, in view of the observed inadequacy of plaintiffs, superintendent Miller chose to discount such factors as tenure and experience, and concluded that the interests of the District would best be served by seeking qualified replacements from outside.

■■■ Such a determination is necessarily judgmental but is no more unreliable than any personnel decision involving the replacement of an incumbent employee, whose weaknesses are known, by a new employee whose weaknesses may yet be hidden. The action must be considered in its historical context, to-wit: early 1966, before the promulgation in desegregation cases of *per se* judicial rules relating to faculty displacement. Thus viewed, this Court finds that the "passing over" of plaintiffs in favor of recruits from outside the District reflected the superintendent's good faith and non-racial judgment that plaintiffs were less qualified for the open positions than those who were newly hired.

■■■ (30) As noted previously, plaintiff Florence Jones was a non-contract teacher employed on a substitute basis. Although her teaching had not been formally assessed by the methods applied to the contract teachers, the superintendent had not been impressed by her performance. She had not been placed on contract because the superintendent believed that she lacked competence and therefore did not merit contractual status. There is no credible evidence suggesting that defendants' failure to continue the plaintiff as a substitute teacher was racially motivated, and the Court finds that it was not so motivated.

(31) On March 9, 1966, all plaintiffs except Florence Jones were sent a letter over signature of superintendent Miller informing them that they had not been recommended for employment during 1966–67. The letter included the following statement:

It is possible that you may be recommended and approved for a 1966–67 contract at a later date. This possibility is conditioned upon the available positions within the district, your qualifications for specific available positions, and your competence as a teacher. You may schedule an appointment to discuss this possibility with me personally at your convenience.

(32) After receiving the superintendent's letter, two of the plaintiffs, Alice Jones and Yarbough Kennedy, submitted formal letters of resignation without further ado. These resignations were accepted forthwith, and these two plaintiffs did not finish the school term. Plaintiffs Shelby, Woodard, Dotson, and John Jones requested and received conferences with the superintendent. Plaintiffs Leviston and Florence Jones made no effort to confer with the superintendent. Plaintiffs Harkless and Jammer contemplated having conferences with the superintendent but were allegedly frustrated in this effort by principal Gee. In the case of the latter two plaintiffs, it is evident that neither tried with par-

ticular diligence to have the conference. In any event, none of the plaintiffs requested or demanded a Board hearing to reconsider the non-renewal decision. Nor, prior to the filing of this suit, did any plaintiff complain to the superintendent or to any Board member that his non-renewal was racially motivated or otherwise constitutionally impermissible.

(33) On May 23, 1966, the instant suit was filed and the superintendent was personally served with process on May 26, 1966. Prior to May 26, the reemployment of one or more of plaintiffs had been a possibility, albeit a remote one. Upon being served, the superintendent took the view that to reemploy any of plaintiffs would prejudice defendants' posture in the litigation. The possibility of reemployment for any of these plaintiffs, already quite small, was thereupon made even more remote.

(34) Although a predominantly rural school district, the District is one of the more affluent in Texas. Much of the prolific Old Ocean oil and gas field lies beneath the District's 154 square miles. This, with its attendant production facilities and refineries, makes for an unusually bountiful tax base. The District does not want for resources, and has traditionally paid among the highest faculty salaries in the State. Prior to 1966–67, the physical plants of four of the campuses, including the all-Negro Carver campus, were approximately equal in quality. The White senior high school was slightly superior to the others in that its building was more modern. Therefore, with respect to structural facilities, White students received slightly better treatment than Negro students in the upper three grades, but approximately equal treatment in the lower nine grades. With respect to teaching tools, such as machines, equipment, supplies and books, the White and Negro students enjoyed equal treatment. The monetary expenditure per pupil prior to desegregation was approximately the same for Negroes as for Whites. To the extent that a per capita variance existed, it favored the Negro students because of the smaller size of some secondary level classes at Carver.

Despite this substantial equivalence in tangible assets, it is clear from this record that the quality of education dispensed at Carver prior to desegregation was inferior to that available in the White schools of the District. The Carver children were educationally disadvantaged. Superintendent Miller conceded that this was the case, and quite plausibly attributed this disparity to the lower quality of instruction available at Carver. Since desegregation, and the incident changes in faculty, the scholastic performance of the Negro children has improved sharply, as revealed by locally-administered achievement tests. This result is in part attributable to the immediate initiation of an enrichment program, which is financed primarily from the District's funds but supplemented with some federal assistance.

The Court takes judicial notice that generally speaking, the success of compensatory education programs has been erratic but their effectiveness seems to vary directly with the input of personnel, i. e., the quality and quantity of teachers devoted to them. If this be true, it is reasonable to attribute the success of the District's remedial program in large part to the competence of the faculty. Indeed, it was the opinion of superintendent Miller that faculty upgrading since unitization has been primarily responsible for the generally improved academic performance of the Negro children. The Court so finds. The Court further finds that this faculty upgrading, both during 1966–67 and thereafter, was the result of an honest and good faith effort on the part of defendants to employ the best available teachers, without regard to race.

## B. CONCLUSIONS OF LAW

### (1) *Advisory Jury.*

At the completion of the supplemental hearing, defendants filed a motion urging the Court to consider the 1969 verdict of the jury as advisory

within the meaning of Fed.R.Civ.P. 39 (c). Such consideration is purely discretionary. Liberty Mutual Insurance Company v. Gerald, 170 F.2d 917 (5th Cir. 1948); 5 Moore's Federal Practice 2d § 39.10(1). In view of the unusual posture of the instant case, with the record containing several days of testimony and numerous exhibits which were not available to the jury, defendants' motion must be and is hereby denied.

### (2) The Burden of Proof.

■ As noted in finding of fact (9), supra, the District unitization was initiated voluntarily; neither the District, its Board of Trustees, nor any individual member of the Board were tainted by any history of resistance to or evasion of responsibility with respect to desegregation. When the time had clearly come, each defendant acted promptly and in good faith to create and did create a unitary system. Unlike so many school districts before it and since, the defendant District in 1965 adopted, and in 1966 implemented, a plan which worked, worked realistically and worked then. Cf. Green v. County School Bd., 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The Court therefore finds no basis in the record for shifting the burden of proof to defendants. Cf. Bonner v. Texas City Independent School Dist., 305 F.Supp. 600 (S.D.Tex.1969).[22]

■ Accordingly, this case presents no occasion for departure from the general rule that non-tenured teachers alleging that they have been dismissed for constitutionally impermissible reasons must bear the burden of proving it. Glover v. Daniel, 434 F.2d 617 (5th Cir. 1970); Sindermann v. Perry, 430 F.2d 939, 944 (5th Cir. 1970), aff'd, 408 U.S. 593, 92 S.Ct. 2513, 33 L.Ed.2d 570

(1972); Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, L.Ed.2d 212 (1974). However, it is appropriate to observe that the assignment of the burden is not determinative of the result in this instance. For, even if the burden were shifted, this Court is persuaded that the defendants have shown by clear and convincing proof that the non-renewal of plaintiffs' contracts was not unlawfully discriminatory. Cf. Moore v. Bd. of Educ. of Chidester School Dist., 448 F.2d 709 (8th Cir. 1971).

### (3) The Filing of the Suit.

■ Plaintiffs contend that they are entitled to prevail because the filing of this suit had the effect of cementing the superintendent's pre-existing resolve not to re-employ them. As an abstract proposition, it is undoubtedly correct that one may not be subjected to a deprivation solely for attempting to judicially vindicate his constitutional rights. However, deprivation implies an interest, and it becomes necessary to inquire whether plaintiffs enjoyed an interest of which they were deprived.

■ When suit was filed, the decision not to renew plaintiffs' contracts in due course had already been made, and was supported by sound and sufficient reasons unrelated to the lawsuit. In any real sense, plaintiffs had already lost their jobs for 1966–67. The Board had already declined to renew their contracts at the March meeting when teaching contracts are normally renewed, and had merely noted that those who were not re-employed might "possibly" be considered at a later meeting. See findings of fact (27) and (31), supra. Therefore, the filing of the suit clearly did not deprive plaintiffs of their jobs. At most,

---

22. The Court's decision, infra in the text, that plaintiffs have completely failed to carry the customary burden of proof which any plaintiff must shoulder makes it unnecessary for the Court to decide whether plaintiffs' burden of proof properly is the much heavier one traditionally demanded of one seeking relief in the nature of mandamus to compel official action. See generally 52 Am.Jur.2d Mandamus § 242 (1970) (re reinstatement of teachers, employees, and administrators of schools); 52 Am.Jur.2d Mandamus § 466 (re burden of proof); United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 57 S.Ct. 855, 81 L.Ed. 1272 (1936).

the filing of the suit may have contributed to removing one or more of them from a hypothetical pool of *possible* employees, in which their status was already tenuous at best. At trial, the Court entertained considerable doubt whether a remote possibility of reemployment is a legally protected interest. The Supreme Court of the United States has since held that it is not. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Thus, even if the filing of their suit caused plaintiffs to be injured, the deprivation was de minimis in nature and not legally cognizable.

### (4) *Procedural Due Process.*

By amendment of the complaint, plaintiffs assert that the means by which their non-renewal was effected violated the procedural due process guarantee of the Federal Constitution. But it is well to remember that due process does not in every instance require a governmental entity to convene a trial-type hearing and honor other judicial traditions before discharging an employee. Cafeteria & Restaurant Workers' Union Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Likewise, unlimited process need not be afforded in all situations where a teacher is dismissed. Lucas v. Chapman, 430 F.2d 945, 947 (5th Cir. 1970). Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) significantly delineated the boundaries of due process in the school setting. *Roth* teaches that the full requirements of procedural due process do not generally apply to the non-renewal of a state-employed teacher's contract. But rather, the safeguards of complete process are applicable only to the deprivation of interests encompassed by the Fourteenth Amendment protections of "liberty" and "property". Stated differently, if loss of employment is accompanied by loss of liberty, the right to complete process would unquestionably accrue. And, if an individual can demonstrate a property right in continued employment, he or she is entitled to some

form of prior administrative or academic hearing on the cause of such non-reemployment.

In the school context, loss of liberty applies if and only if the school board in declining to hire a teacher, makes some charge against him or her that might seriously jeopardize or impair his or her standing, reputation, and associations in the community. *Roth,* supra, 408 U.S. at 572, 92 S.Ct. 2701. See also: Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed. 2d 515 (1971). Plaintiffs here have demonstrated no action on the part of any defendant which might harm their reputations or interfere with the pursuit of their careers except the non-renewal itself. Kota v. Little, 473 F.2d 1 (4th Cir. 1973). In short, there is no reference or suggestion in the present record that any defendant levied any charge of moral corruption or disseminated any damaging rumor or gossip concerning plaintiffs.

In addition, plaintiffs have failed to substantiate a claim of a legally protected "property" interest. Lewis v. Spencer, 468 F.2d 553 (5th Cir. 1972). In the academic setting, if a teacher has tenure, either contractual or *de facto,* then he or she possesses a legal proprietary interest. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Plaintiffs, however, along with all classroom teachers in the District, were employed on the basis of a year to year contract, and therefore, lacked contractual tenure. Despite lack of tenure, plaintiffs, with the exception of Florence Jones, did enjoy a subjective expectancy of annual reemployment. Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970). However, a mere unilateral expectancy of continued employment does not in and of itself necessitate a hearing. Perry v. Sindermann, supra, 408 U.S. at 603, 92 S.Ct. at 2694. Zimmerer v. Spencer, 485 F.2d 176 (5th Cir. 1973). Plaintiffs did not ever assert that they had a legitimate claim or entitlement to job tenure. Neither did they allege the existence of any rules or mutually explicit

understandings promulgated or fostered by the State or District or any other basis which would support a claim of entitlement to continued employment. Therefore, they cannot now be heard to complain of lack of process. Moore v. Knowles, 482 F.2d 1069 (5th Cir. 1973). The failure to hold hearings on each non-renewal did not amount to a procedural deprivation.

 A school district should be entirely free to refuse to reemploy a non-tenured teacher so long as any dismissal of that teacher is not based upon constitutionally impermissible grounds. This Court is, and always has been, firmly of the opinion that a school board should be entirely unfettered to discharge any teacher without tenure which it considers to be unfit to teach the pupils. Bonner v. Texas City Ind. School Dist., 305 F.Supp. 600 (S.D.Tex.1969). Due process only contemplates that an individual be given an opportunity for a hearing before he is deprived of any significant *"property"* interest. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Thus, it is not incumbent upon a school board to hold a hearing every time it determines not to renew the contract of a probationary teacher. Thaw v. Bd. of Pub. Instruction, 432 F.2d 98 (5th Cir. 1970). This is especially true when the termination of an employee is for ostensibly non-constitutional reasons and where the affected employee neither challenges the authenticity of these reasons nor requests a hearing.

The law of the Circuit on this point is concisely stated in Lucas v. Chapman, 430 F.2d 945 (5th Cir. 1970), a teacher contract non-renewal case involving freedom of speech:

> Our holding should not be misunderstood. In this instance we know from the District Court hearing that the asserted reason for termination involved a possible collision with Lucas' First Amendment rights. A hearing was mandatory, *if desired by Lucas.* But *where the only matter in issue is a difference of view over a school board's exercise of judgment and discretion concerning matters non-constitutional in nature, the board is not required to conduct a hearing.* . . . There are in-between situations which are somewhat more difficult. *If the board asserts a non-constitutional reaping on his constitutional rights, son and the teacher claims it is a sham and that the real reason is one im*he must be afforded a hearing. Also, even in the area of non-constitutional reasons, the board's decision must not be wholly unsupported by evidence else it would be so arbitrary as to be a constitutional violation. *Lucas,* supra, 430 F.2d at 947 (citations omitted; emphasis added).

 In the instant case, the non-renewal was purportedly and in fact based upon the non-constitutional reason of professional inadequacy, a determination which was neither arbitrary nor unsupported by evidence. Furthermore, prior to the filing of their lawsuit, plaintiffs did not attach this purported reason as a sham nor did they request a hearing before the Board. Accordingly, the procedure followed by the Board did not deny plaintiffs due process of law.[23]

### (5) Racial Discrimination

As developed at length in the findings above, the decision not to renew plaintiffs' contracts was made on the basis of evaluation procedures which, although subjected at trial to intensive theoretical criticism, proved to be consistent with common practice and to enjoy con-

23. The Court notes that the proper remedy for a procedural deprivation is remand to the school Board for compliance with minimum due process. Perry v. Sindermann, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Plaintiffs have not sought this form of relief at any stage of this litigation.

The Court also notes that the recent *en banc* decision by the Court of Appeals for this Circuit, Sims v. Fox, 505 F.2d 857 (5th Cir., 1974), both in its majority and dissenting opinions, affirms the principles stated in the text.

siderable recognition and support in the literature. Granting the school officials the wide latitude to which they are entitled in employment decisions, Brooks v. School Dist., 267 F.2d 733 (8th Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959), and mindful that the Constitution does not mandate any particular method or philosophy of public school personnel evaluation, the Court concludes that the evaluation technique employed in the District was valid and legally unobjectionable.

■ Although the Constitution expresses no preference among the various methods of teacher evaluation, in the context of school desegregation it does require that evaluations incident to the desegregation process be undertaken on a District-wide basis, whereby all teachers, black and white, are evenhandedly weighed against those similarly qualified for each available position. The Court of Appeals for the Fifth Circuit has stated the rule as follows:

> If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color.

United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 900 (5th Cir. 1966) (opinion by Wisdom, C. J.), aff'd and modified en banc 380 F.2d 385 (5th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). Here, the District comprises the school system. See also: North Carolina Teachers Ass'n v. Asheboro City Bd. of Educ., 393 F.2d 736 (4th Cir. 1968); Williams v. Kimbrough, 295 F.Supp. 578 (W.D.La.) aff'd, 415 F.2d 874 (5th Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 (1970).

For the purpose of structuring the relevant comparison groups, superintendent Miller emphasized the grade/subject-matter presently being taught by each compared teacher rather than state certifications, semester hours of training, or major subject. For the reasons stated in finding of fact (19), supra, this frame of reference for conducting the necessary comparisons was rational and appropriate, and there is no reason to suspect that it was less racially neutral than any other approach which might have been chosen. On this basis, the comparison was made as to each similarly-situated incumbent teacher in the District without regard to race or color. It was therefore constitutionally sound. *Jefferson County*, supra.

Although criticising it from a technical viewpoint, which really amounted to no more than presentation of a professional difference of opinion, plaintiffs offered no persuasive evidence that the District's evaluation methods were racially discriminatory. Instead, it was primarily contended that the methods lacked "objectivity". Although the Court has found to the contrary, even if the District's methods were lacking in complete objectivity, this would not in and of itself entitle plaintiffs to relief, for the elusive goal of objectivity in the literal sense is unobtainable as a practical matter and is therefore not required as a matter of law. Dr. Reutter conceded that complete objectivity in personnel evaluation is impossible, and pointed out that the procedural refinements which he recommended were merely designed to minimize the inherent subjectivity of the process. The Courts have also recognized that the decision to hire, rehire or fire an employee is to a large degree a subjective determination. As the Court of Appeals for this Circuit once stated in a teacher dismissal case, ". . . there are an enormous number of fact situations in which the nonreappointment of an employee may be justified by highly subjective and perhaps unforeseeable considerations." Fluker v. Alabama State Bd. of Educ., 441 F.2d 201, 207 (5th Cir. 1971). Cf. Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Thaw v. Bd. of Pub. Instruction, supra; Buford v. Morgan-

ton City Bd. of Educ., 244 F.Supp. 437 (W.D.N.C.1965).

Implicit in plaintiffs' position is the contention that the only objective manner in which defendants could have evaluated the teachers would have been to limit the inquiry to such mechanically measurable qualifications as state certification, semester hours of subject-matter preparation, years of experience, and years in the District. For the reasons stated in finding of fact (26), supra, this approach might have lent to the process an aura of objectivity because it purports to employ quantifiable data, but it would have been useless and utterly invalid as a means of personnel evaluation. For, as one court has observed:

> Teaching is an art; and while skill in its practice can not be acquired without knowledge and experience, excellence does not depend upon these two factors alone. The processes of education involve leadership, and the success of the teacher depends not alone upon college degrees and length of service but also upon aptitude and the ability to excite interest and to arouse enthusiasm. The superintendent is justified in believing that many people with college degrees can not teach school, whether white or colored.

Morris v. Williams, 149 F.2d 703, 708 (8th Cir. 1945). Individual factors, such as personality, disposition, industry and adaptability vitally affect the work of any teacher. Again, it has been said that "[f]itness for teaching rests upon a broad range of factors and encompasses numerous personality and character traits." Smith v. Bd. of Educ., 365 F.2d 770, 781–782 (8th Cir. 1966). Cf. Beilan v. Bd. of Pub. Educ., 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). The methods of evaluation used by the District's evaluators, individually and collectively, focused the superintendent's recommendation and the Board's ultimate decision with respect to each plaintiff's fitness for teaching on such a "broad range of factors" which encompassed "numerous personality and character traits".

Neither the courts nor the Constitution demand the impossible of school administrators. Therefore, when the courts in desegregation cases have spoken of "objective criteria" in the selection of staff members to be dismissed or demoted, cf. Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970), it is obvious that they are not requiring some heretofore unattainable ideal, as plaintiffs seem to urge. Rather, taken within the context of the problem, desegregation courts have used the word "objective" to mean non-capricious, non-arbitrary, and racially non-discriminatory. In this careful sense of the word, the District's evaluation process was clearly objective, in that it was developed and administered free of bad faith, improper motives or racial implications. In any broader sense of the word, the District's evaluation was only as objective as personnel evaluations conducted by mortals are ever apt to be.

Accordingly, the Court concludes that the method of evaluation and comparison employed by the District in the spring of 1966 was honestly and fairly conducted by qualified professionals acting in a professional way, who were not influenced by impermissible racial considerations. The procedure therefore was consonant with constitutional standards. Smith v. Bd. of Pub. Instruction, 438 F.2d 1209 (5th Cir.), cert. denied, 404 U.S. 865, 92 S.Ct. 61, 30 L.Ed.2d 108 (1971).

To conclude that impermissible racial considerations were not employed is obviously not to say that all factors tangentially related to race were studiously ignored. There is evidence that superintendent Miller held the view that formerly all-Negro colleges in Texas have offered a relatively inferior education to teachers, until recent years. But it is important to consider Miller's testimony in this regard in proper context.

He offered this fact in explanation of plaintiff's lower ranking in the evaluation process, as a result of which lower ranking they were not rehired. Assuming superintendent Miller's opinion and explanation to be correct, it would not follow that Miller's decision was racially infected and therefore, plaintiffs should have been rehired. Miller's explication which recited the well-known fact of formerly relative inferiority of education for teachers in the formerly all-Negro colleges in Texas, would not evidence racial bias on his part in reaching his conclusion not to recommend rehiring of any plaintiff.

Both the Congress and the Courts have recognized the unfortunate but indisputable fact that Negroes have long received inferior education in segregated schools such as the institutions at which these plaintiffs received the balance of their preparation for teaching careers. Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969). This is a fact of life which the superintendent was entitled to consider in explaining the lower ranking of plaintiffs. In scrutinizing Miller's actions, the law does not require this Court to be blind to the same fact. Therefore, the Court concludes that the fact Miller held this opinion with respect to the quality of higher education available to plaintiffs and that such may have or probably did explain their lower ranking in the evaluation process, did not specially taint his decision and did not make his decision constitutionally defective.

Nor, for the same reasons, was it per se unlawful for the superintendent to take cognizance of curriculum director New's infelicitously phrased anecdotal memorandum if indeed the memorandum was considered. For, in assessing teacher competence, such matters as language usage and enunciation do not automatically become irrelevant simply because they may be to some extent racially related. To the contrary, it may well be that it is incumbent upon an administrator supervising desegregation to consider aspects such as language facility and educational deprivation which may be related to race—not because of the innate capacity of a given race, but because of the environmental, political, economic and educational discrimination to which that race has historically been subjected. That certain faculty members should be thus victimized by the desegregation process because of historical factors beyond their control is a sad and regrettable hardship. It is also a hardship suffered in a sense as a result of plaintiffs' race, which will be explained. However, in extirpating this legacy of injustice, hardship and sacrifice have been demanded of all our citizens. The very essence of Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), is that hardship can and will be imposed on a color-conscious racial basis if that is necessary to achieve the great promise of Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Upgrading the quality of education available to all races in the District would indeed be ill served if such hardship imposed on a few teachers should be held to transcend the rights of the greater number of secondary school students envisioned by *Brown* and its progeny.

The pivotal finding of *Brown* was that where a State has undertaken to provide an opportunity for an education in its public schools, such opportunity is a right which must be made available on equal terms; and that segregation of children in public schools solely on the basis of race deprives children of the minority group of equal educational opportunities, thus denying to them equal protection of the laws. To redress this denial, state-imposed segregation in the schools was outlawed, and the hoped-for remedial corollary of this undertaking was that unitization of the schools would result not only in *equal* educational opportunity for children of all races, but an education for Negro children which was *superior* to that previously made available in segregated facilities.

Uncontroverted evidence in the instant record shows that the requirements clearly have been met by the District. Not only in its mechanical but also in its qualitative aspects, desegregation has been achieved. Having been afforded for the first time an opportunity to study in an integrated atmosphere under competent teachers of both races, and having received the benefit of enrichment programs voluntarily instituted by the District, the Negro students' academic achievement level has demonstrably improved since 1966. The superintendent testified that this dramatic change was due in large part to upgrading of the District's faculty as an incident of desegregation. There is no evidence in the record to the contrary. The Court accepts this observation as true.

In the District, a microcosm of secondary education, there is empirical proof that desegregation was not only constitutionally imperative, but was also pedagogically sound. Unwittingly perhaps, plaintiffs would have the Court nullify or seriously abridge this beneficial result. As a practical matter, plaintiffs would impose absolutist and iron-clad constraints upon the discretion of school administrators in replacing less qualified Negro faculty members during the process of desegregation.

The displacement of persons from employment, as an incident of social change, is certainly not a new phenomenon, but the hardship incurred by reason of such displacement is properly a subject for legislative redress. The point has often been made, and rightly so, that some educational authorities in the past may have deemed Negro teachers "good" enough to teach in Negro schools but not "good" enough to teach in desegregated schools. However, in correcting ·the residual effects of this wrongheaded policy, the Court must not take a punitive approach which may remedy personal hardships visited upon some Negro teachers, but does so at the expense of academic excellence or academic opportunity in the public school system, which here is the District.

Although perhaps achieving the goal of career protection for certain Negro teachers, the unacceptable price would be to retreat from *Brown*'s promise of improved educational opportunity for Negro students. To construct a sort of judicially-imposed "tenure" for Negro teachers, in effect guaranteeing them an impregnable position in the classroom from the time of unitization until their retirement, may be appealing from a short-term humanitarian viewpoint, but it is fundamentally at war with the noble purposes of *Brown*. This Court will not lend a hand to it. Accordingly, the Court concludes that superintendent Miller was entitled to consider factors relevant to teaching competence. Miller was entitled to include among such factors the prior inferior educational opportunities available to teachers of the Negro race for the purpose of identifying and employing the most competent available teaching staff. The discrimination, if any, suffered by plaintiffs occurred long before Miller evaluated them in 1966 by virtue of the inferior quality of education afforded them by the State. Such past discrimination, if any, could not properly be erased by Miller in his evaluation or by a judicial declaration of this Court. Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329 (1940). It is lawful for defendants to distinguish and choose between good, poor and bad teachers, as was clearly done in this case. Discrimination on the basis of teaching competence is constitutionally permissible. In the case of the District, the fact that such racially neutral discrimination resulted in a greater attrition of Negroes· than Whites is unfortunate and regrettable, but it does not render the result unconstitutional.

(6) *The Teachers and the Effect of Singleton.*

It has been suggested that the non-renewal of plaintiffs' contracts, coupled with the hiring of White teachers from outside the District is violative of the guidelines enunciated in Singleton v.

Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir. 1969), cert. denied 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). The decree in *Singleton,* which has since been accorded a sort of quasi-statutory generic effect, provided that no vacancy arising by reason of the dismissal or demotion of a Negro teacher might be filled by recruitment of a White teacher from outside the system "until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so." *Singleton,* supra, 419 F.2d at 1218. In effect, this rule has been construed to create a form of tenure. The salutary proviso embodied in the words "who is qualified" has been virtually nullified by reading the phrase to mean minimally qualified, and by raising a legal presumption that one who served on a pre-desegregation faculty is ipso facto deemed to be minimally qualified to serve on a post-desegregation faculty. See Lee v. Macon County Bd. of Educ., 453 F.2d 1104 (5th Cir. 1971).

Defendants in the instant case were not bound to comply with *Singleton. Singleton* and its progeny have been decided in the context of desegregation orders and the inflexible prophylactic nature of their decrees is attributable in part to the inference of bad faith which may arise when a school district must be judicially dragooned into desegregation. Unlike *Singleton,* plaintiffs' dismissals cannot be traced to a court-ordered school consolidation in furtherance of desegregation. Rather, at every juncture, the District acted promptly, prudently and voluntarily to unitize its public school system. Furthermore, the Court of Appeals for the Fifth Circuit has held that the per se aspects of the Singleton decree are not amenable to retroactive application. Lee v. Macon County Bd. of Educ., supra. In *Lee,* the Court explicitly stated:

> The specific per se cast of *Singleton* is more procedural than substantive in its protection of the Fourteenth Amendment rights of principals and teachers affected by desegregation orders, even though the substantive thrust of *Singleton* is clearly an exposition of pre-*Singleton* law. *Singleton's* novelty is procedural in the very sense of that per se pitch, for, if the facts of a case fall within the ambit of *Singleton,* the board is given no authority to explain its failure to reinstate. . . . *But we must take cognizance of the fact that some school districts could conceivably have passed over demoted or dismissed applicants of one race in order to hire applicants of another race whom the board, in good faith and without racial discrimination, considered "more qualified" than the earlier principals or teachers.* That possibility is " . . . an operative fact and may have consequences which cannot justly be ignored. *The past cannot always be erased by a new judicial declaration."* Chicot County Drainage Dist. v. Baxter State Bank, 1940, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329 . . . .

453 F.2d at 1113 (emphasis added). But see: Sparks v. Griffin, 460 F.2d 433, 441 (5th Cir. 1972).

Since the employment decisions of which plaintiffs complain were made almost four years prior to *Singleton,* and prior even to *Jefferson,* it follows that defendants cannot be held to *Singleton's* rigid standard. Instead, as is clear from the emphasized language quoted above in *Lee,* the inquiry with respect to the District is limited to the pre-*Singleton* substantive question of whether defendants in good faith and without racial discrimination concluded that the newly-hired teachers were more qualified than plaintiffs for the positions. As is clear from the findings of fact, that question has been answered in the affirmative.

In short, plaintiffs' dismissals were based upon non-discriminatory standards applied in a non-discriminatory manner. Therefore, the Court finds and concludes that race played no part, directly or remotely, in the Board's determination not to continue plaintiffs' services.

To the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

The Clerk shall file this memorandum opinion and send a copy to all counsel.